## MUSER *v.* MAGONE.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 37.   Argued October 25, 1894. — Decided December 3, 1894.

The valuation of imported merchandise by designated officials is conclusive in the absence of fraud, when the official has power to make it.

In case of disagreement between the general appraiser and the merchant appraiser in regard to the true market value of imported goods, the decision of the collector is final and fixes the valuation.

In this case the appraisers evidently considered that the market value of the goods could be satisfactorily ascertained by the method which they pursued, and their determination, in the absence of fraud cannot be impeached by requiring them to disclose the reasons which impelled their conclusions, or proving remarks made by them.

The dutiable market value of goods is to be determined by their general market value, without regard to special advantages which the importer may enjoy; and in ascertaining that value, it is proper in some instances

to consider the cost of production, including such items of expense as designs, salary of buyer, clerk hire, rent, interest, and percentage on aggregate cost of the business.

THIS was an action brought by Frederick W. Muser, Richard Muser, and Curt Muser, composing the firm of Muser Brothers, against the collector of the port of New York, to recover duties alleged to have been illegally exacted of them on certain importations of cotton embroideries, manufactured at St. Gall, Switzerland, where they had a branch house. Their course of business there was as follows: The cloth on which the embroideries were stitched was purchased in the gray state by plaintiffs at Manchester, and received in their warehouse in St. Gall. It was then sent out to various parties at St. Gall who had stitching machines, and stitched the goods according to patterns or designs furnished by plaintiffs, which designs had either been purchased by them in Paris or made in their St. Gall establishment by designers employed by them. The goods when stitched were returned to the warehouse, and having been examined by plaintiffs' employés to see if they were properly done, were sent out again to a bleacher to be bleached. When bleached, they were brought back, reëxamined, cut into strips of suitable size for the American market, ticketed, boxed, and shipped. To carry on this business in St. Gall, plaintiffs rented a building, employed a staff of assistants, paid insurance, and kept a certain amount of capital invested.

Finished embroideries were not kept in stock for sale at St. Gall in 1887, the date of these importations. The goods were usually ordered from samples submitted by the manufacturers or by so-called commissionaires. The commissionaires, as a rule, submitted samples to the purchasers, bought the cloth, and turned it over to the manufacturer to make up. Their charge for their own services, according to plaintiffs, was three per cent besides all expenses. According to other testimony, the commissionaire would require an advance of the necessary capital to do the trade with, and also all the cash discounts, amounting to another three per cent. If he were asked to employ his own capital and make his own

designs, his charge would vary; it might be less than ten per cent, or it might be more, but ten per cent would not be any more than a fair profit. It was within the knowledge of one of the merchant appraisers that one of the largest manufacturers in St. Gall was coming to New York to do business for ten per cent profit.

Plaintiffs' goods were invoiced at their actual gross cost, omitting any cash discount; any charge for designing; any interest and risk on capital; any allowance for salaries or other office expenses at St. Gall. They added three per cent to the invoice price "to make market value," but they claimed upon the trial that this addition was not voluntary, but was made to avoid the advance of duty provided by statute in cases where the appraised value exceeds the entered value by ten per cent. This three per cent was not more than enough to cover the expense of designing alone, and interest and risk on capital was sometimes itself rated at eight per cent.

It appeared that for many years prior to 1887, St. Gall embroideries had been appraised in the same way as in that year, but, the question of undervaluation being raised, they had been advanced from ten to forty per cent. In the fall of 1885, the Treasury Department appointed a commission to investigate the matter, which met at the public stores in New York city. Merchants interested in the cotton embroidery trade also had a meeting, arrived at certain recommendations, and appointed a committee to present them to the commission and see them carried out. A member of Muser Brothers was one of this committee. The conviction was expressed in the resolutions of the meeting that the counting of the stitches was "the only proper way for arriving at a correct valuation of cotton embroideries, Oriental and Egyptian laces;" and "that it be recommended that the appraiser, in appraising cotton embroideries, Oriental and Egyptian laces, should appraise them by counting the stitches and valuing them at the rate at which they are quoted by the U. S. consul on the day of shipment, adding to this the cost of the cloth, and adding to this ten per cent, to be called manufacturer's profit, then the cost of bleaching; finishing,

and putting up." Subsequently, and after conference with the general appraiser and the commission, the committee agreed that the ten per cent should "be added to the cost of the goods in a finished condition, including the cost of the bleaching, finishing, and putting up." It was also recommended that "the minimum rates for stitching adopted by the manufacturers' union at St. Gall should be the basis of the appraisement, but if the price of the stitching should be advanced, the invoice should be in accordance therewith." One of the plaintiffs signed the committee's communication to the commission and the subsequent agreement, but on the same day sent to the commission a written protest stating that he doubted the authority for the exaction of the ten per cent on the cost of the price for cloth and stitching, but had no doubt at all as to the illegality of the exaction on the charges incurred for bleaching and finishing.

As to one of the importations in question here, an advance of seven per cent was made by direction of the merchant appraiser, but the reason therefor did not appear, and no reappraisement was called for or had. As to the other importations, the appraiser raised the entered value about nine per cent. The plaintiffs demanded a reappraisement, upon which the merchant appraiser in one case approved the entry; in the other cases the merchant appraisers recommended an advance of six per cent; the general appraiser made the advance about ten per cent; and the collector decided in favor of the general appraiser.

Plaintiffs protested "against the standard of value adopted by the appraising officers and of their appraised value as returned by them and approved by" the collector, upon various grounds, in substance, because the standard dutiable value of the merchandise established by the collector included, "besides the actual market value or wholesale price, commissions and charges non-dutiable under section 7, act of March 3, 1883, c. 121, 22 Stat. 488, 523;" because the goods should have been appraised at their actual market value or wholesale price in the gray, adding to such value the cost for laundrying and finishing them, and no more, as provided by section 2906 of the Revised Statutes and section 7 of the act of March 3, 1883, whereas

there had been illegally included "a further amount to cover the incidental charges incurred in the purchase and preparation of said goods for shipment, such charges or incidental expenses being for designs furnished the manufacturer, salary of the buyer, and clerk hire, rent of buyer's office, and rooms for putting up and packing for shipment, interest on money credits for the purchase of the goods and for a profit or commission in excess of such aggregate cost, or one or more of such charges," which charges or items of costs were nondutiable under section 7; because the goods were dutiable " at no more than the cost or value of the materials composing such merchandise, together with the expense of manufacturing, preparing, and putting up such merchandise for shipment as provided in section 9, act March 3, 1883;" "that the standard marketable condition of embroideries is in the gray; that the wholesale current market prices for regular goods bought in the regular manner is usually quoted in the gray, according to the number of stitches contained in a given pattern; such price plus the market value of the muslin upon which the stitching is done constitutes their marketable value in their wholesale marketable condition; to this value is to be added the expenses for laundrying and finishing, to make dutiable value under existing laws, and no more."

By section 2902 of the Revised Statutes, it was made the duty of the appraisers of the United States, . . . . by all reasonable ways and means, . . . . to ascertain, estimate, and appraise the true and actual market value and wholesale price . . . of imported merchandise, at the time of exportation, and in the principal markets of the country whence the same has been imported into the United States; and, by section 2904, the day of actual shipment is made the day as of which the duty is to be estimated.

Section 2906 provided: .

"When an ad valorem rate of duty is imposed on any imported merchandise, or when the duty imposed shall be regulated by, or directed to be estimated or based upon, the value of the square yard, or of any specified quantity or parcel of such merchandise, the collector . . . shall cause the

actual market value, or wholesale price thereof, at the period of the exportation to the United States, in the principal markets of the country from which the same has been imported, to be appraised, and such appraised value shall be considered the value upon which duty shall be assessed."

By section 2907, in determining the dutiable value, there was to be added to the market value "the cost of transportation, shipment, and transshipment, with all the expenses included, from the place of . . . manufacture . . . to the vessel in which shipment is made to the United States; the value of the sack, box, or covering of any kind in which such merchandise is contained; commission at the usual rates, but in no case less than two and a half per centum; and brokerage, export duty, and all other actual or usual charges for putting up, preparing, and packing for transportation or shipment. All charges of a general character incurred in the purchase of a general invoice shall be distributed *pro rata* among all parts of such invoice."

Section 2908 provided that all additions made to the entered value of merchandise for charges should be regarded as part of the actual value of such merchandise, and if such addition exceeded by ten per cent the value declared, in addition to the duties, twenty per cent duty should be collected.

Section 2930 read thus:

"If the importer, owner, agent or consignee, of any merchandise shall be dissatisfied with the appraisement, and shall have complied with the foregoing requisitions, he may forthwith give notice to the collector, in writing, of such dissatisfaction; on the receipt of which the collector shall select one discreet and experienced merchant to be associated with one of the general appraisers wherever practicable, or two discreet and experienced merchants, citizens of the United States, familiar with the character and value of the goods in question, to examine and appraise the same, agreeably to the foregoing provisions; and if they shall disagree, the collector shall decide between them; and the appraisement thus determined shall be final and be deemed to be the true value, and the duties shall be levied thereon accordingly."

Sections 2907 and 2908 were repealed by the seventh section of the act of March 3, 1883, which further declared —

"And hereafter none of the charges imposed by said sections or any other provisions of existing law shall be estimated in ascertaining the value of goods to be imported, nor shall the value of the usual and necessary sacks, crates, boxes, or covering of any kind be estimated as part of their value in determining the amount of duties for which they are liable." 22 Stat. 523, c. 121, § 7.

The ninth section of this act was as follows:

"Sec. 9. If upon the appraisal of imported goods, wares, and merchandise, it shall appear that the true and actual market value and wholesale price thereof, as provided by law, cannot be ascertained to the satisfaction of the appraiser, whether because such goods, wares, and merchandise be consigned for sale by the manufacturer abroad to his agent in the United States, or for any other reason, it shall then be lawful to appraise the same by ascertaining the cost or value of the materials composing such merchandise, at the time and place of manufacture, together with the expense of manufacturing, preparing, and putting up such merchandise for shipment, and in no case shall the value of such goods, wares, and merchandise be appraised at less than the total cost or value thus ascertained." 22 Stat. 525.

The action was tried before Judge Lacombe and a jury, and a verdict directed in favor of the collector. Judgment having been entered upon the verdict given in accordance with such direction, this writ of error was sued out. The opinion of the Circuit Judge is reported in 41 Fed. Rep. 877.

*Mr. Edwin B. Smith,* (with whom was *Mr. Charles Curie* on the brief,) for plaintiffs in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The conclusiveness of the valuation of imported merchan-

dise made by the designated officials, in the absence of fraud, is too thoroughly settled to admit of further discussion. *Hilton* v. *Merritt*, 110 U. S. 97 ; *Auffmordt* v. *Hedden*, 137 U. S. 310; *Passavant* v. *United States*, 148 U. S. 214. In *Auffmordt* v. *Hedden*, it was said: " The government has the right to prescribe the conditions attending the importation of goods, upon which it will permit the collector to be sued. One of those conditions is that the appraisal shall be regarded as final. . . . The provision as to the finality of the appraisement is virtually a rule of evidence to be observed in the trial of the suit brought against the collector."

Yet, though the valuation is final and not subject to review and change and reconstruction by the verdict of a jury, it is open to attack for want of power to make it, as where the appraisers are disqualified from acting ; or have not examined the goods ; or illegal items have been added independent of the value. The principle applied in such cases is analogous to that by which proceedings of a judicial nature are held invalid because of the absence of some strictly jurisdictional fact, or facts, essential to their validity.

But, in the language of Mr. Justice Blatchford in *Auffmordt* v. *Hedden*, p. 328 : " This case does not present any question like that of substituting a new merchant appraiser for one already selected, as in *Greely* v. *Thompson*, 10 How. 225 ; nor is it a case where the appraiser did not see the original packages, as in *Greely's Administrator* v. *Burgess*, 18 How. 413 ; nor a case where it was offered to show that the merchant appraiser was not a person having the qualification prescribed by the statute, as in *Oelbermann* v. *Merritt*, 123 U. S. 356, and in *Mustin* v. *Cadwalader*, 123 U. S. 369 ; nor a case where it was contended that the appraisers did not open, examine, and appraise the packages designated by the collector, as in *Oelbermann* v. *Merritt;* nor a case where to the admitted market value of an importation there was added such additional value as was equal to a reduction made in the valuation of the cases containing the goods, as in *Badger* v. *Cusimano*, 130 U. S. 39. Those were instances of errors outside of the valuation itself and outside of the appraisement prescribed by the statute."

The protest in this case had no relation to want of qualification or to insufficiency of examination, but was directed to the alleged illegality of the valuation, whether the method pursued was to ascertain "the true and actual market value and wholesale price," under section 2902 of the Revised Statutes, or the value on the basis of cost of production under section 9 of the act of March 3, 1883, because, as alleged, one of the constituent elements of the value as found was illegally included.

The Circuit Court held that the action of the appraisers was a finding of market value, and that conclusion was clearly right. The certificates of the appraisers were in the usual form, that "the actual market value or wholesale price of the said goods at the period of the exportation thereof to the United States, in the principal markets of the country from which the same were imported into the United States," was as stated; and it appeared in terms therefrom that the advances by the original appraiser, and by the importers, were "to make market value," though the importers contend their advance was made to avoid the imposition of additional duties.

We must assume that the conclusion of the appraisers was that the market value could be ascertained to their satisfaction, and such determination is binding. *Stairs* v. *Peaslee*, 18 How. 521.

The Circuit Judge was of opinion that section 9 of the act of March 3, 1883, applied to cases where goods are made abroad but are sold only in this country, and that the section did not apply to these goods, which were in effect purchased at St. Gall at an ascertainable expenditure. He said: "So far as the evidence shows, any one can go to St. Gall, and can there buy these very cotton embroideries, not precisely of the same pattern as Mr. Muser's, but he can get a selection from a large variety of assorted patterns, and upon paying the cost of the cloth, stitching, bleaching, cutting up, and boxing, and the additional charge, he can obtain these goods in St. Gall. He may have to wait for a week, or three weeks, or five or six weeks; but the title to the goods changes hands in St. Gall, and the purchaser may have them delivered to him there, if he chooses to wait and take them."

We concur in this view and in the argument that the appraisers in treating the goods as having a true market value, evidently considered that while such value might vary as the quality of the materials and size or intricacy of the patterns varied, it could be satisfactorily ascertained by a general computation of all charges incurred by the commissionaire, who occupied the position of a wholesale dealer, including that for his own service, and that the elements entering into the true valuation of the commodity would embrace such items as office rent, wages of employés, superintendence, interest on capital, risk, etc.; so that what was called manufacturers' profit was merely a percentage to cover the miscellaneous expenses and allowances necessary to be taken into account in reaching the true valuation of the goods.

In the matter of *Cliquot's Champagne*, Judge Hoffman defined the market value of goods to be " the price at which the owner of the goods, or the producer, holds them for sale; the price at which they are freely offered in the market to all the world; such prices as dealers in the goods are willing to receive, and purchasers are made to pay, when the goods are bought and sold in the ordinary course of trade;" and the definition was approved by this court. *Cliquot's Champagne*, 3 Wall. 114, 125, 142.

We regard it as quite sufficient for the inquiry here, and cannot discover any legal ground which would have justified the Circuit Court in overhauling the judgment of the revenue officials that the mode of doing business in respect of these embroideries at St. Gall afforded the data for a " true and actual market value and wholesale price," within the intent and meaning of the act, for the commissionaires stood in the place of wholesale dealers, and the items made up the price they were willing to receive and purchasers were made to pay in the ordinary course of the trade.

It is argued for the collector that much of the evidence which was admitted was incompetent, but, waiving that question, we are of opinion that the Circuit Court did not err in directing a verdict for the defendant.

We do not consider it necessary to specifically review the

fifty-one errors assigned in the brief of plaintiffs in error.
What we have said disposes of those relating to the direction
to the jury, and the others, which present exceptions to the
rulings of the Circuit Court in the admission or exclusion of
evidence, require but few observations. Some of the questions
to which objections were sustained were propounded as to
matters which were fully brought out elsewhere in the evi-
dence, and the exclusion of merely cumulative testimony can-
not be said to have injured the plaintiffs, since that which was
admitted was sufficient to test the correctness of the direction
of the verdict. Some of them were aimed at eliciting the
expenses of Muser Brothers' establishment at St. Gall; the
total expenditures there; what they paid their designer;
the amount of embroideries obtained; and so on, in 1887,
but all this was immaterial. The question was not whether
through the special advantages which Muser Brothers enjoyed
the actual cost to them may have been less than what was
decided to be the actual dutiable value of their goods, for the
latter was determined by the general market value and whole-
sale price of all goods of the same description.

Other questions went to the grounds of the decision of the
revenue officers, and involved the extent, if at all, to which they
might be examined in relation thereto. For instance, the gen-
eral appraiser was called as a witness, and asked the following
questions: " Q. In making your report upon these several
invoices, and in adding ten per cent to the invoice value, did
you or not take into consideration as a part of that ten per cent
any manufacturer's profit?" " Q. Did you in making that
addition ascertain the cost of the cloth, of the stitching, the
bleaching, and finishing, and then add to that sum as a part
of the ten per cent, anything for charges incurred in the pur-
chase and preparation of said goods for shipment?" " Q. Upon
what ground and to cover what did you add the ten per cent
or the sum that you did add to the invoice?" Objections to
these questions were severally sustained and exceptions taken.
Upon the case made these inquiries were either immaterial or
incompetent.

It is not pretended that the action of the appraisers was in

bad faith or in any respect fraudulent. The issue made by the protest was that the valuation was illegal because including certain specified incidental expenses, (one or more of them,) as for designs, salary of buyer, clerk hire, rent, interest, and percentage on aggregate cost. Upon the theory of an ascertainable market value at St. Gall, these were matters to be considered and in a sense included, but not in the sense of substantive items independent of market value added thereto to make dutiable value.

Plaintiff contended that the dutiable value consisted in the market price of the embroideries in the gray, according to the number of stitches in a given pattern, plus the market value of the muslin and the expenses for laundrying and finishing and no more, but, as we have indicated, the Circuit Court rightly declined to sustain that contention.

The law imposed the duty upon the general appraiser and the merchant appraiser to ascertain and determine the value, and it was provided that in case of disagreement the collector should decide between them. The collector affirmed the decision of the general appraiser, and the valuation became fixed accordingly.

These officers were appointed and required to pronounce a judgment in each case, and the proper operation of the revenue system necessitated, in the opinion of Congress, that their decisions should be final and conclusive. The presumption is that a sworn officer, acting in the discharge of his duty, upon a subject over which jurisdiction is given him, has acted rightly, and there is nothing in this record which, in the slightest degree, tends to indicate that the general appraiser did not endeavor by all reasonable ways and means to arrive at the true and actual market value. Among such ways and means are market price or the quotations for a given day; amounts realized on sales, public and private; and in some instances the cost of production. The course of business at St. Gall in respect of these embroideries was peculiar, and to reach a result, in estimating the value, required the consideration of many elements making up the amount which actually represented the pecuniary basis of transactions. How these

various elements impressed the general appraiser, and what grounds influenced or controlled his mental processes, were matters in respect of which he could not be interrogated, since his decision, when approved by the collector, was final, and could not be reviewed and the verdict of a jury substituted. The proper evidence of the decision of the appraisers and of the collector was to be found in their official returns, and if they acted without fraud and within the powers conferred on them by statute, their decision could not be impeached by requiring them to disclose the reasons which impelled their conclusions or by proving remarks they may have made in the premises.

The adjudication was of true market value, and did not consist in taking market value and adding the cost and charges specified in section 2907 in order to get at dutiable value. The percentage of the commissionaires was not the "commission" named in that section, which plainly refers to other agents than these St. Gall dealers, and, moreover, all these ingredients must be regarded as simply taken into consideration in making up an opinion, and the valuation could not be picked to pieces by an investigation into the sources of information which may have influenced the officers in the judgment they pronounced. The seventh section of the act of March 3, 1883, had no application.

We think that the cause was properly tried, and that the record exhibits no material error, if any.

*Judgment affirmed.*