### WOLFF *v.* UNITED STATES (No. 175).[1]

1. FINAL APPRAISEMENT.

The customs laws contemplate finality at some point in all appraisement proceedings and finality is by law attached on appeal to an appraisement by the Board of General Appraisers, when the appeal comes to the board from a finding of a general appraiser, and a decision of that board on the actual market value of the merchandise in question is conclusive against all parties interested therein.

2. MATTING REAPPRAISED.

And, without inquiring into the objections urged against the reappraisement of matting by a local appraiser as erroneous, or as unsupported by the evidence, or as founded on irrelevant considerations, the Board of General Appraisers on appeal having found that appraisal correct, this finding can not be disturbed.

#### United States Court of Customs Appeals, January 11, 1911.

TRANSFERRED from United States Circuit Court, Eastern District of Louisiana, G. A. 6888 (T. D. 29628).

[Affirmed.]

*Brooks & Brooks (Frederick W. Brooks* of counsel) for appellants.

*D. Frank Lloyd,* Assistant Attorney General (*Charles E. McNabb* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, and BARBER, Judges.

SMITH, Judge, delivered the opinion of the court:

On April 18, 1907, 1,000 rolls of fancy, superfine, 116 warp Chinese matting, measuring some 40,000 square yards, was exported from

---

[1] Reported in T. D. 31217 (20 Treas. Dec., 100).

China to the United States and arrived in New Orleans in June, 1907. The goods were valued in the consular invoice at 20 cents Hongkong currency per square yard, less nondutiable charges and the usual discount of 2 per cent. The local appraiser at New Orleans advanced the value to 23 cents per square yard, in the same currency, less discount and nondutiable charges.

It appears from the evidence in the case that the local appraiser was induced to make this advance by reason of the fact that a board of three general appraisers, acting as a board of reappraisement, had previously appraised at 23 cents other importations of the same class of merchandise. Upon notice by the importers of dissatisfaction with the advance made by the local appraiser, the importation went to reappraisement before a general appraiser, who, taking into account the testimony which induced Board No. 3 to recede from its valuation of 23 cents to that of 20¾ cents per square yard on similar merchandise, felt compelled not to go below the lesser rate, and reappraised the importation at that figure as the proper value of the matting. The importers being still dissatisfied, this reappraisement was in due course submitted to three general appraisers and by them affirmed, sitting as a board of reappraisement. The appraisement and reappraisement proceedings ultimately resulted, therefore, in fixing the valuation of the matting at 20¾ cents Hongkong currency per square yard, which, when reduced to our own money at the official rate for the quarter in which the merchandise was exported, brought its value, after deducting discount and nonduitable charges, to a fraction more than 10 cents per square yard United States currency. The collector of customs accordingly assessed the goods for duty at 7 cents per square yard and 25 per cent ad valorem, under the provisions of paragraph 333 of the tariff act of 1897, which reads as follows:

Floor mattings, plain, fancy, or figured, manufactured from straw, round or split, or other vegetable substances not otherwise provided for, including what are commonly known as Chinese, Japanese, and India straw mattings, valued at not exceeding ten cents per square yard, three cents per square yard; valued at exceeding ten cents per square yard, seven cents per square yard and twenty-five per centum ad valorem.

The importer protested that the entered value of the matting was the actual market value thereof, as defined by section 19 of the act of June 10, 1890; that duty had been assessed on a valuation in excess of said market value; that the proofs submitted to the appraiser, general appraiser, and the board of three general appraisers did not warrant the value found in either of the three appraisements; that in all of the appraisements before mentioned the appraisers proceeded on a wrong principle, contrary to law, and transcended the powers conferred on them by statute. The Board of General Ap-

praisers, sitting as a classification board, overruled the protest, and the importers, having applied for a rehearing, which was denied, perfected an appeal to the United States Circuit Court for the Eastern District of Louisiana, from which court a transfer of the case was made to this court, in accordance with the provisions of the tariff act of August 5, 1909.

Section 10 of the act of June 10, 1890, entitled "An act to simplify the laws in relation to the collection of the revenues," provides:

That it shall be the duty of the appraisers of the United States, and every of them, and every person who shall act as such appraiser, * * * by all reasonable means in his or their power to ascertain, estimate, and appraise * * * the actual market value and wholesale price of the merchandise at the time of exportation to the United States in the principal markets of the country whence the same has been imported.

Section 13 of the act requires the appraiser to report to the collector his decision as to the value of the merchandise appraised, and makes his decision final against the importer unless the latter gives due notice of dissatisfaction therewith, in which event it is provided that the matter shall be submitted to a general appraiser, whose finding becomes conclusive unless an appeal is properly taken to a board of three general appraisers, the decision of which is declared to be "final and conclusive as to the dutiable value of such merchandise against all parties interested therein."

This legislation had for its object the prompt collection of the Government revenues and was dictated by the consequent necessity for a speedy and *final* settlement of the all-important questions of actual market value and wholesale price of imported goods at the time of exportation. By it Congress confided to certain officers and a special tribunal exclusive jurisdiction of the subject matter of valuation and clearly manifested its intention that the basis upon which ad valorem duties are assessed and collected should not be submitted to the long, tedious, and necessarily complicated processes of judicial determination. When, therefore, those officers and that tribunal charged by the law with the special duty of appraising imported merchandise have acted within the powers conferred by statute, the exercise of their discretion on the subject matter of their jurisdiction, and the justice, correctness, and validity of their appraisement should not and can not, in the absence of fraud, be subjected to review by the courts.

It is a general principle that when power or jurisdiction is delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter. * * * The interposition of the courts, in the appraisement of importations, would involve the collection of the revenue in inextricable confusion and embarrassment. Every importer might feel justified in disputing the accuracy of the judgment of the appraisers, and claim to make proof before a jury, months and even years after the article

has been withdrawn from control of the Government, and when the knowledge of the transaction had faded from the memories of its officers. Bartlett v. Kane (16 How., 263, 272).

When the value of the merchandise is ascertained by the officers appointed by law, and the statutory provisions for appeal have been exhausted, the statute declares that the "appraisement thus determined shall be final and deemed to be the true value, and the duties shall be levied thereon accordingly." This language would seem to leave no room for doubt or construction. * * * After Congress has declared that the appraisement of the customs officers should be final for the purpose of levying duties, the right of the importer to take the verdict of a jury upon the correctness of the appraisement should be declared in clear and explicit terms. So far from this being the case, we do not find that Congress has given the right at all. If, in every suit brought to recover duties paid under protest, the jury were allowed to review the appraisement made by the customs officers, the result would be great uncertainty and inequality in the collection of duties on imports. It is quite possible that no two juries would agree upon the value of different invoices of the same goods. The legislation of Congress, to which we have referred, was designed, as it appears to us, to exclude any such method of ascertaining the dutiable value of goods. * * * We are of opinion, therefore, that the valuation made by the customs officers was not open to question in an action at law as long as the officers acted without fraud and within the power conferred on them by statute. Hilton v. Merritt (110 U. S., 97, 104, 106).

The Government has the right to prescribe the conditions on which it will subject itself to the judgment of the courts in the collection of its revenues. One of those conditions is, and always has been, that the determination of appraisers as to the dutiable value of goods shall be conclusive and not reexaminable in a suit at law, provided the appraisers are selected in conformity with the statute, and, in appraising, act within the scope of the powers conferred upon them. * * * The provision as to the finality of the appraisement is virtually a rule of evidence to be observed in the trial of the suit brought against the collector. Auffmordtt v. Hedden (137 U. S., 310, 324, 329).

The provisions of the customs administrative act of June 10, 1890, as to the finality and conclusiveness of the decision of the Board of General Appraisers as to the valuation of imported merchandise, when that question has been regularly submitted to and examined by them, is expressed in clearer and more emphatic terms than in former statutes. The language is so explicit as to leave no room for construction. In the tariff legislation of the Government, Congress has generally adopted means any methods for a speedy and equitable adjustment of the question as to the market value of imported articles, without allowing an appeal to the courts to review the decision reached. If dissatisfied importers, after exhausting the remedies provided by the statute to ascertain and determine the fair dutiable value of imported merchandise, could apply to the courts to have a review of that subject, the prompt and regular collection of the Government's revenues would be seriously obstructed and interfered with. The statute authorizes no such proceeding, and the circuit court can exercise no such jurisdiction. Passavant v. United States (148 U. S., 214, 220).

The conclusiveness of the valuation of imported merchandise made by the designated officials, in the absence of fraud, is too thoroughly settled to admit of further discussion. * * * Yet, though the valuation is final and not subject to review and change and reconstruction by the verdict of a jury, it is open to attack for want of power to make it, as where the appraisers are disqualified from acting, or have not examined the goods, or illegal items have been added independent of the value. The principle applied in such cases is analogous to that by which proceedings of a judicial nature are held invalid because of the absence of some strictly jurisdictional fact or facts essential to their validity. Muser v. Magone (155 U. S., 240, 246).

Under the provisions of the law itself, and the interpretation given to it by the courts for a period of nearly 60 years, it would seem that the only question raised by the importers' protest which we can consider is, Did the appraising officers, in fixing the market value and wholesale price of the matting at the time of exportation to the United States in the principal markets of the country from which it was imported, exceed their powers, or, to use the language of the protest, did they proceed "on a wrong principle and transcend the powers conferred on them by statute?" To support this claim of the protest, counsel for the appellant insist that the evidence establishes—

First. That the local appraiser at New Orleans did not use all reasonable ways and means in his power to ascertain market value, as it appears from the testimony that after obliging the importers to present to him all papers and documents which tended to sustain the *entered* value, he decided to follow the valuation fixed on previous importations of the same kind of goods by the Board of General Appraisers acting as a reappraisement board, although believing that his appraisement would be reduced on appeal and the presentation of further evidence.

Second. That the appraisement made by the local appraiser was made of the actual market value and wholesale price of such matting at a date anterior to its exportation to the United States.

Third. That the valuation made on appeal to the general appraiser was made on a false idea as to the value of Hongkong currency, and that his appraisement of 20¾ cents a square yard in that currency was made in the belief that when converted into United States money it would give a valuation of 10 cents or less a square yard and thus entitle the goods to entry at the lower rate of duty.

Fourth. That the appraisement of 20¾ cents Hongkong currency a square yard made by the Board of General Appraisers, acting as a board of reappraisement on the appeal, was made on the basis of a valuation fixed by Board No. 3 for the same kind of goods exported anterior to the importation under consideration and in the belief that in the meantime Hongkong currency had not advanced in value—a belief which was not correct.

When analyzed, these contentions, with the exception of the second, finally resolve themselves into a claim that the appraisers wholly disregarded the evidence submitted by the importer, that they permitted themselves to be influenced by appraisements previously officially fixed by boards of reappraisement for the same kind of merchandise, that they were mistaken as to the value of Hongkong currency on the date of exportation, and that the conclusions reached were not warranted by the facts before them. Giving to the importer the full benefit of all these claims and admitting for the moment that

they are fully supported by competent evidence, nothing more can be deduced from them than that the board's decision was against the evidence, that it was not supported by the evidence, that the appraisers drew a wrong conclusion from the evidence, and that therefore their finding was erroneous. They do not show, or even tend to show, that the appraisers assumed or exercised a jurisdiction or power not conferred on them by law. Error or mistake made in the exercise of power and jurisdiction is one thing and the exercise of a power or jurisdiction not lawfully conferred is quite another.

From mistakes and errors made by the appraiser and general appraiser in the exercise of their power and jurisdiction to appraise, the statute provides the remedy of appeal to a board of general appraisers, and when that body has passed upon the appeal the door is closed by the express terms of the statute upon further inquiry into the matter. Origet v. Hedden (155 U. S., 228). To permit of a review of a decision of the appraisers on the ground that it was erroneous, that it was mistaken, that it was incorrect, that it was induced by a wrong conception of the facts, that the appraisers had not used good judgment, that they ignored facts which they should have considered or gave weight to evidence which should have been excluded, would overturn the whole system so carefully and wisely elaborated by Congress for the determination of values and the prompt collection of customs duties. Inquiry into value and the methods of reaching it must end somewhere, and when Congress decided that it should end with an appeal to the Board of General Appraisers sitting as a reappraisement board, its wishes in that behalf should be respected, especially as a judicial revision could afford no higher guaranties of a flawless judgment, no better security for a decision free from error, than does that of the system which the legislature saw fit to establish. Evidence that appraising officers were careless, or even irregular, in the performance of their duties falls short of showing that they assumed powers not conferred on them by the statute, and their valuation can not be impeached by evidence of that character. Neither is it competent to inquire as to whether the appraisers followed or disregarded the evidence produced before them. Hilton v. Merritt (110 U. S., 97, 107); Auffmordtt v. Hedden (137 U. S., 310, 325). Estimates of value require the consideration of many elements.

*How these various elements impressed the appraiser, and what grounds influenced or controlled his mental processes,* were matters in respect of which he could not be interrogated, since his decision, when approved by the collector, was final, and could not be reviewed and the verdict of a jury substituted. The proper evidence of the decisions of the appraisers and of the collector was to be found in their official returns, and if they acted without fraud and within the powers conferred on them by statute, *their decision could not be impeached by requiring them to disclose the reasons which im-*

*pelled their conclusions* or by proving remarks they may have made in the premises. Muser *v.* Magone (155 U. S., 240, 251-252); see, also, Origot *v.* Hedden (155 U. S., 228, 235); Chicago, Burlington & Quincy Railway Co. *v.* Babcock (204 U. S., 585, 593).

The fact that a method of appraisement is employed which would lead to erroneous results and which could not be relied upon as a safe guide in any case does not nullify the appraisement. Bartlett *v.* Kane (16 How., 263, 271).

Appraisements have been reviewed where the appraisers were disqualified from acting, *and therefore had no power, authority, or jurisdiction to make them.* Greely *v.* Thompson (10 How., 225); Oelbermann *v.* Merritt (123 U. S., 356); Mustin *v.* Cadwalader (123 U. S., 369). They have been set aside by the courts when the appraisers have not examined or seen the goods which the law required them to examine or appraise and had therefore *failed to acquire in the manner prescribed by statute jurisdiction of the subject matter* upon which they were to exercise their discretion and judgment. Greely's Administrator *v.* Burgess (18 How., 413); Oelbermann *v.* Merritt (123 U. S., 356). They have been declared invalid by judicial tribunals where the appraisers, after finding market value and wholesale price, have, independent of such value, added on items which it was not their function, but that of the collector to determine and from the finding of which by the collector *an appeal to the courts is expressly allowed by the provisions of sections 14 and 15 of the act of June 10, 1890.* United States *v.* Passavant (169 U. S., 16, 19); United States *v.* Klingenberg (153 U. S., 93, 101, 104); Badger *v.* Cusimano (130 U. S., 39, 43); Hilton *v.* Merritt (110 U. S., 97, 106); Robertson *v.* Frank (132 U. S., 17, 24); Oberteuffer *v.* Robertson (116 U. S., 499, 515).

But these decisions have carefully refrained from impeaching the appraisement in so far as it related to the simple finding of market value, and even where "charges" have been considered by appraisers as an element and factor in reaching a conclusion as to such value the courts have declined to interfere. Belcher *v.* Linn (24 How., 508); Passavant *v.* United States (169 U. S., 16, 25).

If the official rate at which foreign currency is to be converted into money of the United States was an item to be considered by the appraisers in reaching a judgment, any mistake made by them as to the rate in force was a mistake of fact and as such is not reviewable. In this connection it may be said, however, that it is the duty of the appraisers to find market value in the currency of the country from which the goods are imported. (Customs Regula- 1892, arts. 830, 845; Customs Regulations, 1899, arts. 1246, 1266.) The conversion of that value into United States currency is the duty of the collector and is made by him after the appraisement has been finally determined and reported. (Customs Regulations, 1892, art. 296; Customs Regulations, 1899, art. 409.) The appraisers

found the value of the matting to be 20¾ cents Hongkong currency a square yard, which was the currency of the country from which the merchandise was imported. The collector converted that appraisement into United States currency admittedly at the correct official rate.

If the finding of the appraisers really and truly represented their best judgment, and it must be assumed that it did, 20¾ cents Hongkong currency a square yard was therefore the correct value of the merchandise at the time of exportation in the country from which it was imported. What that value might become in the United States after it had been converted by the collector for the purposes of assessing duty was no concern of the appraisers, and any error under which they may have labored concerning it can hardly be held to have invalidated their appraisement. There is nothing in the evidence or in the record to warrant the claim that the final appraisement of the importation fixed its value as of a time anterior to its exportation. The fact that the Board of General Appraisers consulted with Board No. 3 as to valuations which it had fixed on previous importations of the same kind of merchandise shows no more than that the tribunal of final appraisement took previous valuations into account as an element to be considered in reaching its own decision as to actual market value, and is far from showing that the value finally determined upon was not the value at the time of exportation. Even if we were permitted to inquire into the methods employed by appraisers in coming to a decision, even if we could review the factors and evidence which induced them to make up their minds on the subject confided to their discretion and judgment by the lawmaking power, we would not be justified in holding that previous values of the same goods should have been entirely eliminated from consideration.

One of the most important reasons for the creation of a Board of General Appraisers was to secure through that body uniformity of appraisement and classification. To realize this purpose consultation between appraisers and general appraisers and between the different boards of general appraisers was not only a prudent and wise precaution, but a necessary one. Unaided by such consultation each board of appraisers might very well fix a different value on merchandise of the same kind exported from the same country at the same time, and that result at the very least would be provocative of appeals which might be avoided if the several appraisers and boards conferred before finally reaching a conclusion. (See Customs Regulations, 1899, arts. 1702, 1703, 1704, *1705*, and 1711.)

The decision of the Board of General Appraisers is *affirmed.*

De Vries, Judge, having participated in the decision of the board, did not sit.