## UNITED STATES v. AMERICAN LINSEED CO. et al.

(District Court, N. D. Illinois, E. D. November 3, 1921.)

No. 1490.

1. **Monopolies ⬤⟼24(2)—Extent of burden of proof on government stated.**

In proceedings by the government against an alleged combination under the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), it is incumbent on the government to show illegal combination by the clear preponderance of the evidence, and, in absence of direct proof and in face of denial under oath, the government must show that what defendants did necessarily had the result of restraining trade, and, if depending on circumstantial evidence, must show that the circumstances are entirely inconsistent with the supposition of innocence.

2. **Monopolies ⬤⟼12(3)—Association under open price plan held not obnoxious to anti-trust laws.**

An association of dealers in linseed oil under so-called "open price plan," with a bureau proposing to collect and furnish to the various members current quotations, record of sales, statistics as to stock on hand, crop conditions, and other information, with agreement by members to furnish information as to daily prices and to make no sudden change without notice, *held*, in absence of direct evidence of acts hurtful to trade, not a combination in restraint thereof contrary to the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830).

3. **Evidence ⬅➡18—Judicial notice taken of price decline.**

> In proceedings against alleged combination in restraint of trade, the court may take judicial notice that a general decline in prices has been going on for several months.

4. **Monopolies ⬅➡12(3)—Meaning of "stabilized market" in agreement of associated dealers defined.**

> The admission in books of defendant, charged with conspiring in restraint of trade contrary to the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), that the bureau furnishing news to the association brought about a "stabilized market," did not necesarily mean nothing other than uniform prices, but, in view of the circumstances, meant the obtaining and distributing of accurate information that would enable dealers better to understand the conditions of the market of the article dealt in, to the end that speculative hazards might be minimized or eliminated.

5. **Monopolies ⬅➡24(2)—Evidence of opportunity to control prices not alone sufficient.**

> Evidence showing a combination of dealers in linseed oil under agreement to furnish and receive information as to prices, conditions of market, etc., showing opportunity alone for control of prices, was not sufficient.

In Equity. Proceeding by the United States against the American Linseed Company and others, under the Sherman Anti-Trust Act. Bill dismissed.

Henry S. Mitchell, and C. Stanley Thompson, Sp. Asst. Attys. Gen., and Charles F. Clyne, U. S. Dist. Atty., of Chicago, Ill., for the United States.

John Walsh and L. A. Spiess, both of Washington, D. C., and Eastman, White & Hawxhurst, of Chicago, Ill., for defendants Ankeney Linseed Mfg. Co., Archer-Daniels Linseed Co., Minnesota Linseed Oil Co., Northern Linseed Oil Co., Red Wing Linseed Oil Co., Toledo Seed & Oil Co., Mann Bros. Co., Julian Armstrong, and Montague Ferry.

Reed, Meals & Eichelberger, of Cleveland, Ohio, for defendants Sherwin-Williams Co., National Lead Co., and Hirst & Begley Linseed Co.

Rounds, Hatch, Dillingham & Debevoise, of New York City, for defendant American Linseed Oil Co.

Willet M. Spooner, of Milwaukee, Wis., for defendant William O. Goodrich Co.

Alexander & Green, of New York City, for certain defendants.

William J. Matthews and Hugh T. Martin, both of Chicago, Ill., amici curiæ.

CARPENTER, District Judge. In this case the United States, pursuant to the powers and duties imposed upon it by the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), challenged as a combination or conspiracy a contract between the defendants, linseed oil crushers, and the Armstrong Bureau.

The defendant Julian Armstrong, in October, 1918, organized the Linseed Oil Council and operated it as a member of the Armstrong Bureau. The purpose of the council and bureau was to collect and furnish to the various members current quotations on linseed oil, the

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

record of sales of oil, including prices, statistics as to stocks on hand, crop conditions at home and abroad, and other information of interest or value to the manufacturers of linseed oil. The Armstrong Bureau entered into contracts with certain of the defendants and agreed to furnish them the foregoing information for a consideration.

Pursuant to these contracts, the various subscribers daily reported their price lists to the bureau, and promptly sent word of any change. Other information was also furnished from time to time. The statements received and collected by the bureau were immediately sent out to all the members of the association.

The record discloses that the information collected and distributed by the bureau to its several members was of the kind which a sagacious business man secures, or endeavors to secure, in the operation of his enterprise. The information was true. The price lists furnished were made in the regular course of business, and offered in good faith to customers or prospective customers. There was no proof that the members of the association ever, at the bureau meetings or at any other place, discussed prices or made agreements with respect to prices, and there was no evidence that the prices asked by any of the subscribers were not in accordance with the market price of flaxseed, upon which the price of linseed oil was based.

Production was not limited during the period the bureau was in operation. There was no proof of division of territory. There was no proof that the prices asked by the individual defendants were not fixed by them upon their own judgment, considering all factors affecting supply and demand. There was no proof showing that any member was under the slightest obligation or constraint to ask higher prices or maintain prices.

The main argument for the United States is that the operation of the bureau tended towards a stabilization or uniformity of price on any given day, which was not due to competition, in accordance with economic law.

Many tables of statistics were offered in evidence and read to the court, from which there appeared at times a striking similarity in price, and that changes in prices were made by substantially all the members coincidentally.

It appears further that the price of linseed oil is controlled by the price of flaxseed, and that the flaxseed market is an open one in which there are wide fluctuations as well as inactive periods.

The government has not shown that there was artificial regulation of price, either by definite oral or written agreement or by tacit understanding.

Each individual crusher entering into a contract with the Armstrong Bureau specifically and expressly agreed that all information reported to the bureau or distributed by it should at all times be purely statistical and pertain only to past operations, and that the bureau should not be used to enable the constituent members to fix prices for the sale of linseed oil, cake, or meal; to limit the sale, production, or manufacture thereof; or to divide the territory in which it was to be sold.

[1] It is incumbent upon the government to show by the clear pre-

ponderance of the evidence that the defendants conspired to restrain interstate commerce. In the absence of direct proof of actual entering into of such a combination, and in the face of the denial under oath of the defendants that any such conspiracy or combination was entered into or made, the government must show that what the defendants did necessarily had the result of restraining trade, or, if it relies upon the circumstantial evidence to show that a conspiracy was actually entered into, it must show to the satisfaction of the court that the circumstances upon which reliance is placed are entirely inconsistent with supposition of innocence.

[2] The question involved is whether an association, such as the Armstrong Agency (sometimes called the "Open Price Plan"), is obnoxious to the anti-trust laws, whether or not there is anything inherently wrong in an agreement between producers in a certain line to furnish each other their prices and not to make any sale deviating from the price list without immediately notifying all the others.

Associations of merchants and manufacturers, boards of trade, and exchanges are of great antiquity. Evidently such associations were not aimed at by the Sherman Act, because they are not mentioned in the act. A distinction is sought to be drawn between the operations of an exchange and what was done by the defendants through the Armstrong Bureau. An exchange sends out reports of actual sales. The Armstrong Bureau gave out price lists. It is difficult to understand any ground for declaring one legal and the other illegal. Every producer or merchant desires to obtain for his goods the highest price he can get. The price which he charges is always the highest which he believes the traffic will bear. He cannot charge, ordinarily, more than his competitors. His competitors' price fixes the point above which he cannot go. When the merchant fixes the price at the level of his competitors, he is fixing it in competition with his rival just as much as though he had named a lower price. The competition of his rival has prevented him from charging a higher price. If, on the other hand, he finds that he cannot move his goods at the price fixed by his competitors, he will naturally lower the price, and this will establish a new level. This is the essence of what constitutes competition.

Quotations established by the sales on an exchange establish the market value at the time of the sale, but not the market value the day after. The prices at which goods are offered for sale at any moment establish the market value at that moment.

In those lines of merchandising where there are no exchanges, the prices which producers and dealers put upon their goods constitute the market price. Cliquot's Champagne, 3 Wall. 114, 18 L. Ed. 116. In the trial of that case the judge charged the jury as follows:

"The market value of goods is the price at which the owner of the goods, or the producer, holds them for sale; the price at which they are freely offered in the market to all the world; such prices as dealers in the goods are willing to receive, and purchasers are made to pay, when the goods are bought and sold in the ordinary course of trade."

The above language was cited and approved by the Supreme Court in Muser v. Magone, 155 U. S. 240, at page 249, 15 Sup. Ct. 77, at page 81 (39 L. Ed. 135).

If it is lawful for dealers to get together in an exchange and provide for a dissemination of the prices obtained on actual sales, why should it be unlawful for those producers and dealers in lines where no public exchange has been established, to make some provision for disseminating information of market value or prices? To put it in another way, why should they be limited to the dissemination of the market prices of yesterday, but not those of to-day.

In order to obtain efficiency in business, as well as in any other human activity, it is necessary to have reliable, immediate, and adequate records. With the progress that has been made in the last century it is not to be expected that business alone stood still.

In the old days when at noon the business men of the community met in the village blacksmith shop, or in the evening met at the corner grocery, a man was supposed to carry in his head all the facts in regard to his business and never to disclose them to a competitor. Adequate systems of accounting had not been devised. Overhead as a cost element in operation was unheard of. Business was run by the rule of thumb. Such days have gone by. The commercial enterprise of to-day which is not so managed that its head can at any time know how large is his stock, the volume of his sales, the cost of his operation, and the amount of his profit and loss, sooner or later will be distanced by competitors.

It is because business is so much more complex, the volume so much greater, the margin of profit on single transactions so much less, that the merchants of to-day must have at instant command reliable and adequate information, immediately to be secured and more or less permanent in form. Business is no longer a game of chance, but a matter of scientific calculation.

A merchant cannot compete with another merchant unless he knows what he must compete against. A knowledge of what his competitor is charging is the first step in competition. It does not follow, because one man knows the price which his competitor is asking, and he then fixes the same price, that his action is by agreement. If his competitor charges a high price, he naturally will ask the same price if he thinks he can get it. It is absurd to imagine that every merchant does not endeavor to keep posted on the prices asked by his competitor. If he fails to keep posted, he will find himself losing money. If his prices are too high, his customers leave him. If too low, he fails to reap the profit to which he is entitled. The government cannot seriously contend that it is the duty of every merchant to guard against his competitor, finding out what he is charging. It would be an impossibility. Nor is it wrong for a merchant to endeavor to find out what his rivals are charging. If he cannot get it directly and easily, he will necessarily get it indirectly and at a great expense and slowly. He must know in order to conduct his business properly; nor does the public profit by the mistakes of a merchant charging too much on the one hand or too little on the other, for want of such information. The mistakes would in all probability fall equally on either side.

Quick and accurate information of what his competitors are charging naturally leads to uniformity in prices. But because one mer-

chant charges the same price that the other merchant charges, because he finds that he can get it, does not necessarily indicate that there is any agreement between them to charge the same price. As the Supreme Court said, in the Steel Case, 251 U. S. 417, 40 Sup. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121, a uniformity in price does not prove a conspiracy.

What applies to sales for present delivery, applies equally to sales for future delivery.

[3] Much has been made by counsel for the government of the fact that prices of oil went up along with the price of flaxseed; that afterwards when flaxseed declined sharply, the price of oil did not come down at the same rate, but declined at a much slower pace. The court will take judicial knowledge that for the past several months a decline in prices has been going on. The government has failed to show that the phenomenon of the price of oil declining at a slower rate than the price of flaxseed·was not common in other lines, where the price of raw materials has fallen. That the price of the finished product on a declining market will fall at a slower rate than the price of the raw material is natural, and therefore expected. The price of the finished· material, under conceded economic rules in the market where there is competition, will depend upon the supply and demand of the finished material. The drop in the price of the raw material does not affect the supply of the finished material. Time must elapse before the supply of finished material is increased by the low prices of raw material, and until the supply of finished material is increased, assuming that the demand remains constant, no decline in price may be expected. When the price of raw material starts to go up, less of the finished material· will be produced, and stoppage or slowing up of the manufacture of the finished material will be at once reflected in an increased price.

The court should not construe the acts of the defendants to be illegal when it can, with equal facility, ascribe them to an innocent intention.

But it is charged by the government that the defendants themselves claim that the effect of the bureau was to stabilize prices. That is to say, as a result of accurate and instant knowledge on the part of producers, the price of linseed oil, instead of varying sharply from day to day, as shown by the sales made, assumed an average price without the deviations. If these deviations before had been the result of real competition, based on accurate knowledge by the producers of the real market conditions, then the government is far from sustaining its contentions. The defendants, however, have shown, and their evidence is uncontradicted, that the deviations before existing were caused by the individual producers endeavoring to meet· prices of their competitors which had never been made; and it is common in the trade for buyers to make false representations as to the prices made by other producers. Surely, such a condition is not the one that the Sherman Act aims to foster.

[4] The government was greatly disturbed by a statement in the defendant Ferry's books that the Armstrong Bureau brought about a

stabilized market. This expression seems to have been a great bugaboo. Counsel for plaintiff would have the court believe that the term "stabilized market" means nothing other than uniform prices. Whatever the proper definition of the phrase, the record does not show that there was a stabilization or uniformity in prices.

The defendants contend, and I agree, that the term "stabilized market" means the obtaining and distributing of any accurate information that would enable crushers and buyers of linseed oil the better to understand the conditions of the flaxseed and oil market, to the end that the speculative hazards which formerly had worked injury to both seller and buyer would be minimized and eventually eliminated, and the economic law of supply and demand be more intelligently put into operation.

Complaint is made against what is called the "zone system" and differentials applying thereto. It is true the prices quoted had reference to certain well-defined territory, and the prices were accompanied by differentials to equalize the cost of railroad transportation. The record shows that these differentials were adopted after a thorough and intelligent investigation of freight rates from the base point to point of delivery, and the addition to the base price in the different zones was arrived at after a fair averaging of those freight rates into the designated territory.

Zoning for the purpose of fixing rates is not new. The Interstate Commerce Commission permits it in regulating the charges to be made by railroads. It is not a perfect system, and there is always a certain amount of discrimination to those who live on or near the dividing line between zones, and I have no doubt a few buyers of oil may have been to some extent penalized, but every buyer had the option of purchasing f. o. b. point of manufacture, or f. o. b. point of delivery, and I must assume that this buyer would choose that f. o. b. point which seemed the most to his advantage.

The charge of the government that the zone differentials were adopted in order that the price charged for oil would be artificially enhanced, and the defendant crushers consequently enriched, is not borne out by the evidence. There was no zone in which all the crushers did business, and the bulk of the finished product sold by the defendants was for delivery in zones carrying minimum freight differentials.

Counsel for the government seeks to draw an inference of guilt from the admission of defendants that the bureau allowed them to sleep nights. The only restraint which the rules of the bureau on their face impose is that the members agree not to deviate from their price lists without informing the other members at once by telegraph. At the close of each business day every member knew until the next day what the market was. It seems to me that the situation thus created is not dissimilar from that sustained by the United States Supreme Court in Chicago Board of Trade v. United States, 246 U. S. 231, 38 Sup. Ct. 242, 62 L. Ed. 683. It is very evident that the Supreme Court does not believe that the Sherman Act should prevent men from sleeping nights.

275 F.—60

The Armstrong Bureau was organized solely for the purpose of furnishing information not only to the linseed oil crushers, but to those interested in every other industry. It was a bureau of intelligence, and one which makes for real rather than artificial competition in trade. There was no restriction placed upon any member. He was free to buy from and sell to whomever he chose. The bureau operated solely as to past transactions, and wherever there is freedom of contract on the part of the constituent members there cannot be a violation of the Sherman Act.

[5] The prosecution, down deep, evidently believes that an association of producers or merchants must necessarily be obnoxious to the Sherman Act because it affords an opportunity for the members to conspire to restrain trade.

Where there is such an association, it is perfectly natural for members to express themselves as to conditions and prices; in fact, that is what the association is formed for, and these expressions have been seized upon by counsel as evidence to show that a corrupt agreement was actually made.

To my mind some of these expressions are evidence that no such agreement was in fact made, if they are evidence of anything. It would be perfectly natural, among a meeting of oil men, for some one to say that he thought prices ought to be higher. The meaning conveyed by such an expression would be that the man was at a loss to understand why prices were not higher, taking into consideration the demand and supply and conditions of the trade. I might well say to-day that the weather ought to be cooler without laying myself open to the imputation that the temperature had been fixed by an agreement of mine.

Logic which assumes that because there is an opportunity to fix prices, therefore prices are fixed, is contrary to the genius and theory of our law. Every man is presumed to be innocent until he is proved to be guilty. If the Armstrong Bureau is to be dissolved merely because it afforded an opportunity for the members to fix prices, then this court, with equal propriety, could be asked to dissolve any lunch club where business men meet. This theory hardly warrants discussion, and I would not mention it had I not been gravely urged in this case, that such was the underlying thought of the prosecution. It is the ancient fallax—post hoc propter hoc.

The bill will be dismissed for want of equity.