UNITED STATES *v.* JOHNSON Co. (No. 1886).[1]

1. APPRAISEMENT—CLASSIFICATION BOARD'S POWER OVER.

To justify a classification board in declaring null and void an appraisement by three general appraisers on the ground that it was based upon a wrong theory of law, it must appear *positively, clearly,* and *certainly* that they *did* proceed upon such wrong theory. United States *v.* Johnson Co. (7 Ct. Cust. Appls., 466; T. D. 37050). All appraising officers and boards of appraising officers authorized and directed by the statute to assess and charge the property of the citizen with Government dues, being creatures of the statute, their procedure finding warrant only in the words of the statute, are bound in their procedure to follow the statute; and any deviation therefrom is without warrant of law and void. The prescribed mode is the measure of power.

2. CONSTRUCTION, PARAGRAPH L, SECTION III, TARIFF ACT OF 1913—"CONSIGNED FOR SALE."

The expression in paragraph L, Section III, tariff act of 1913, "consigned for sale in the United States" does not have reference only to cases where the consignment was made to an "agent" of the consignor; it includes cases where the consignor in another country shipped the goods to himself in this country.

3. CONSTRUCTION, PARAGRAPH L, SECTION III, TARIFF ACT OF 1913—"SUCH OR SIMILAR IMPORTED MERCHANDISE."

In the language of paragraph L, Section III, tariff act of 1913, "the wholesale price at which such or similar imported merchandise is actually sold or freely offered for sale in usual wholesale quantities in the United States in the open

---

[1] T. D. 38215 (37 Treas. Dec., 261).

market," the word "such" means identical. The provision does not mean that the inquiry must be confined to the identical merchandise if possible and extended to similar merchandise only in the event of the absence of proof as to the identical merchandise. It means that appraising officers may take into consideration not only sales of the very merchandise imported but also sales of similar merchandise. Since the word "such" means identical, the paragraph can not be taken to mean that the inquiry as to market value in this country must be as of the time when the exportation was made.

4. APPRAISEMENT BY BOARD OF APPRAISERS FINAL.

Pineapples were prepared and canned in Bahama by the Johnson Co. and shipped by them to themselves in New York. The merchandise concededly had no market value in Bahama. Appraisement by a board of general appraisers was nullified by a classification board. There was before the appraisement board evidence as to the cost of production and as to the sale price in this country of it and similar merchandise. Of this evidence and the weight to be given it or any part of it the appraisement board were the sole judges. Whatever method of appraisement prescribed by paragraphs K and L, Section III, tariff act of 1913, was adopted by them—cost of production, sale price of the identical merchandise, or sale price of similar merchandise—was supported by *some* substantial evidence. The decision of the Board of United States General Appraisers nullifying their appraisement is reversed.

United States Court of Customs Appeals, December 9, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8112 (T. D. 37431).

[Reversed.]

*Bert Hanson,* Assistant Attorney General (*John R. Rafter,* special attorney, of counsel), for the United States.

*Walden & Webster* (*Henry J. Webster* of counsel) for appellee.

[Oral argument Oct. 14, 1919, by Mr. Hanson and Mr. Webster.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal presents an issue relating to the validity of certain reappraisement proceedings. While the issue is tendered as to the validity of the appraisement proceedings before the single general appraiser, as well as on appeal before the board of three general appraisers, in our view of the case the latter alone is here determinative.

The case previously was before the court and decided in United States *v.* Johnson Co. (7 Ct. Cust. Appls., 466; T. D. 37050). While the record of the proceedings herein discloses marked misapprehension as to what was there decided by the court, a reading of that opinion seems to require no exposition of the matter therein decided. The case was submitted upon a stipulation which recited in effect that *all* the evidence before the reappraisement board was not contained in the record. The challenge of the decision of the board was in part upon the ground that it had not proceeded according to law in that it had rested decision upon a class of evidence as to market value not warranted by the statute governing such cases and therefore proceeded without warrant of law. This court announced as the law of the case

upon this issue that "To justify a classification board in declaring null and void an appraisement by three general appraisers on the ground that it was based upon a wrong theory of law, it must appear *positively,* *clearly,* and *certainly* that they *did* proceed upon such wrong theory. This does not appear from a record which does not contain a recital of all the facts before the reappraisement board and does not contain any statement as to the theory of law upon which such board proceeded." The court further held that the decree of the board was so uncertain and ambiguous that upon the facts of the case it could not be enforced. Wherefore, the decision of the board was reversed.

Upon petition for rehearing by the importers reciting as grounds therefor that they were entitled to a certain and enforceable decree by the board, and, that "*the entire record* in the reappraisement proceedings *is easily procurable,* and it would seem fair to the board to permit them to pass upon the issue with the entire record before them, as well as fair to the parties," this court entered a reversal and duly ordered a new trial of the case before the board. [Italics ours.]

The record upon that rehearing clearly establishes that *certain* evidences were before the single general appraiser and the board. The record discloses that there was *some* substantially competent evidence before the board upon the subjects necessary to support their findings, and further evidencing that in their proceedings to a conclusion there was some substantially competent evidence in support of such proceedings, this court is without power to review that evidence or to pass upon its sufficiency.

The classification board by a divided opinion, in the decision here under review, held as before that the reappraisement by the board was invalid in that the reappraisement board had not pursued the statute prescriptive of their powers.

Fundamentally, that all appraising officers and boards thereof, charged by the statute with, and by statute authorized to assess and charge the property of the citizen with Government dues, being creatures of the statute, their procedure finding warrant only in the words of the statute, and having no existence or authority outside of the statute, are bound in their procedure to pursue the statute, and any deviation therefrom is without warrant of law and void, is in this court stare decisis. As frequently aptly expressed the prescribed mode is the measure of power. The board below made no question of this fundamental rule. If authorities need be given as reference, a few thereof will be found collected in Tilge v. United States (2 Ct. Cust. Appls., 149, 151; T. D. 31676, wherein we said:

That all appraisers and those performing such duties, local and general, acting singly or by boards, are officers constituted under and whose powers and procedure are created, limited, and defined by statute is undeniable.

Consistently, after the rendition of that decision early in the history of this court and in numerous decisions thereafter, the ruling was approved and followed.    Oelrichs & Co. *v.* United States (2 Ct. Cust. Appls., 365; T. D. 32091); Maddaus *v.* United States (3 Ct. Cust. Appls., 330; T. D. 32623); Gallagher & Ascher *v.* United States (4 Ct. Cust. Appls., 404; T. D. 33849); Shallus *v.* United States (5 Ct. Cust. Appls., 317; T. D. 34525); United States *v.* Johnson (7 Ct. Cust. Appls., 466; T. D. 37050).

Appropriate at this point is quotation of the prescribed powers and duties of appraising officers here pertinent.    That procedure is fixed by paragraphs K and L, Section III, of the tariff act of 1913, pertinently, as follows:

K. That it shall be the duty of the appraisers of the United States, and every of them, and every person who shall act as such appraiser, or of the collector, as the case may be, by all reasonable ways and means in his or their power to ascertain, estimate, and appraise (any invoice or affidavit thereto or statement of cost, or of cost of production to the contrary notwithstanding) the actual market value and wholesale price of the merchandise at the time of exportation to the United States, in the principal markets of the country whence the same has been imported, and the number of yards, parcels, or quantities, and actual market value or wholesale price of every of them, as the case may require

L. That when the actual market value, as defined by law, of any article of imported merchandise, wholly or partly manufactured and subject to an ad valorem duty, or to a duty based in whole or in part on value, can not be ascertained to the satisfaction of the appraising officer, such officer shall use all available means in his power to ascertain the cost of production of such merchandise at the time of exportation to the United States, and at the place of manufacture, such cost of production to include the cost of materials and of fabrication, and all general expenses to be estimated at not less than 10 per cent, covering each and every outlay of whatsoever nature incident to such production, together with the expense of preparing and putting up such merchandise ready for shipment, and an addition of not less than 8 nor more than 50 per cent upon the total cost as thus ascertained; and in no case shall such merchandise be appraised upon original appraisal or reappraisement at less than the total cost of production as thus ascertained.    The actual market value or wholesale price, as defined by law, of any imported merchandise which is consigned for sale in the United States, or which is sold for exportation to the United States, and which is not actually sold or freely offered for sale in usual wholesale quantities in the open market of the country of exportation to all purchasers, shall not in any case be appraised at less than the wholesale price at which such or similar imported merchandise *is* actually *sold or freely offered for sale in* usual wholesale quantities in the United States in the open market, due allowance by deduction being made for estimated duties thereon, cost of transportation, insurance, and other necessary expenses from the place of shipment to the place of delivery, and a commission not exceeding 6 per cent, if any has been paid or contracted to be paid on consigned goods, or profits not to exceed 8 per cent and a reasonable allowance for general expenses (not to exceed 8 per cent) on purchased goods.

The stipulation which is here in evidence embraces all necessary evidence in the case to support the decision of the reappraisement board.    The testimony in this record makes clear exactly what

portion thereof was before the general appraiser and that before the reappraisement board of general appraisers.   It reads:

It is hereby stipulated and agreed between the attorneys for the parties hereto:

1. That the merchandise in question is 100 cases of canned pineapples imported from Nassau, Bahama Islands, in October, 1914. and properly dutiable at 20 per cent ad valorem under paragraph 217, tariff act of 1913. That said goods were invoiced, entered, appraised by the local appraiser at New York, appealed to reappraisement, which was passed on by General Appraiser Waite; appealed to reappraisement, which was passed on by Board No. 2, consisting of General Appraisers Fischer, Howell, and Cooper; that the merchandise was packed six tins in each case, each tin being of the size formerly called gallons, now known as No. 10, containing somewhat less than one gallon each; that all the tins and cases were of the manufacture of the United States and entitled to free entry under paragraph 404, act of 1913; that the contents were invoiced and appraised as follows:

| | For 100 cases. | Equals per case. | Equals per dozen |
|---|---|---|---|
| Coreless sliced: | | | |
| Invoiced | $112.86 | $1.1286 | $2.2572 |
| Entered by importer | 163.86 | 1.6386 | 3.2772 |
| Appraised by local appraiser | 163.86 | 1.6386 | 3.2772 |
| Appraised by general appraiser | | 1.808 | 3.616 |
| Appraised by Board of General Appraisers | | 1.808 | 3.616 |

2. That at the trials of the reappraisement case before the single general appraiser and Board 2, it was not contended by either party that there was any market or market value in the Bahama Islands for canned pineapples; that the importer herein, a New York corporation. maintained a canning factory at Nassau, Bahama Islands, and packed and shipped the whole output to itself in New York, and sold the same in the United States; that the invoice in this case purports to state the cost of production and other items as specified in the first part of paragraph L of section 3, act of October 3, 1913, and was in detail as follows, only the first lot of 100 cases being the subject of this protest:

100 c/s gallons coreless sliced pineapple, preserved in its own juice,
   30 pounds fruit to c/s, packed 6 tins to c/s:
     Fruit, at 88 cents per c/s _____ $88.00
     Labor, at 7 cents per c/s _____ 7.00
     Gen'l exp., 10 per cent _____ 9.50
     Profit on total cost as above, 8 per cent _____ 8.36
                                  $112.86

100 c/s gallons sliced pineapple, with cores, preserved in its own juice,
   30 pounds fruit to c/s, packed 6 tins to c/s:
     Fruit, at 88 cents per c/s _____ 88.00
     Labor, at 7 cents _____ 7.00
     Gen'l exp., 10 per cent _____ 9.50
     Profit on total cost as above, 8 per cent _____ 8.36
                                  112.86

                                  225.72

Charges:
   200 c/s for gallon tins, at 162/5c _____ 32.80
   200 c/s gallon tin (6 tins to c/s, at 33 cents) _____ 66.00
   Cartage, at 1 cent per c/s _____ 2.00
   Consular fee _____ 2.50
                                    103.30

                                    329.02

Ins. carried in U. S. A.

III. The entry as made by the importer bore the following indorsement, made pursuant to the last clause of paragraph I of section 3, act of October 3, 1913:

I hereby certify that the entered value of the merchandise mentioned below was higher than the foreign market value and that the goods are so entered in order to meet advances by the appraiser in similar cases now pending on appeal for reappraisement. The similar cases now pending are entries Nos. 189, 095 at the port of New York.

I contend that duty shall be assessed on the basis of the value shown below as the foreign market value.

Items, preserved pineapples; invoice value, $225.72; add to make foreign market value, $139; foreign market value, $225.72; add to meet advance by appraiser in similar cases, $139; entered value, $364.72.

> J. S. JOHNSON CO.,
> By WM. H. SMITH, *V. P., Importer.*

IV. That the assessment as made by the collector was as follows:

$99 free.

| | |
|---|---:|
| $381 at 20 per cent | $76.20 |
| Additional duty, $181, at 10 per cent | 18.10 |
| | 94.30 |
| Amount as entered | 73.00 |
| Increase | 21.30 |

V. That, at the trial before the reappraising board herein, the record in the previous reappraisement No. 75118 was admitted in evidence; that the following parts of the record in reappraisement No. 75118, hereto attached, may be admitted in evidence in this case:

Letter from Special Agent Hermes, marked "A," and inclosure, tabulated statement also marked "A."
Letter from Special Agent Hermes marked "B."
Stipulation marked "C."
Statement of cost of production marked "D."
Testimony.
Dated New York, October 23, 1915.

Omitting signatures and filing marks, Exhibits A and B referred to in the stipulation are as follows:

EXHIBIT A.

NOVEMBER 5, 1914.

ASSISTANT UNITED STATES ATTORNEY GENERAL,
*641 Washington Street, New York City.*

SIR: In compliance with the verbal request of Mr. Rafter of your office, there is transmitted herewith a tabulation showing the dutiable values of four kinds of canned Bahama pineapple. imported by the J. S. Johnson Co., said values having been determined by figuring back from the United States selling prices, under Paragraph L of section 3 of the tariff act of 1913, for use in proceedings now pending before the Board of General Appraisers

Respectfully,

——— ———,

J. S. JOHNSON Co.

Dutiable values of canned Bahama pineapple, determined by figuring back from the United States selling prices, under Paragraph L of section 3 of the tariff act of October 3, 1913.

*No. 10, gallons, coreless, sliced.*

Average selling prices in the United States, per dozen cans.................. $6. 009

Expenses per dozen cans:

   (1) Cans, of American manufacture, delivered f. o. b. Baltimore or New
        York, $45.50 per 1,000 .......................................... 0. 546

   (2) Cases, of American manufacture, delivered f. o. b. Baltimore or New
        York, 13½ cents each........................................... .27

   (3) Ocean freight on cans and cases from Baltimore or New York to
        Nassau, 8½ cents per case....................................... .17

   (4) Marine insurance on cans and cases going to Nassau, 1½ per cent.... .012

   (5) Drayage from factory to wharf at Nassau, 1 cent per case........... .02

   (6) Ocean freight on the finished product, Nassau to New York, 10½
        cents per case............................................... .21.

   (7) Marine insurance on the finished product, Nassau to New York, ¼
        per cent of the estimated dutiable value plus expenses 1, 2, 3, 4,
        and 5....................................................... .012

   (8) Drayage in New York, from wharf to cars, 2 cents per case in Man-
        hattan; 3 cents per case in Brooklyn; average 2½ cents per case... .05

   (9) Cash discount 1½ per cent......................................... .09

   (10) Loss on account of swells and leaks, estimated 2½ per cent of selling
        prices...................................................... .15

   (11) Brokerage, estimated at 1⅓ per cent of selling prices................ .08

   (12) Duty, 20 per cent of the estimated dutiable value.................. .733

      Total expenses............................................... 2. 343

United States selling prices, as above.................................... 6. 009
Less expenses.......................................................... 2. 343

Dutiable value of contents per dozen cans................................ 3. 666
Correction on cartage.................................................. .05

                                                              3. 616

EXHIBIT B.

NOVEMBER 7, 1914.

ASSISTANT UNITED STATES ATTORNEY GENERAL,
        *641 Washington Street, New York City, N. Y.*

  SIR: Referring to the tabulation showing the dutiable values of certain kinds of
canned Bahama pineapple, transmitted to you under date of the instant for use in
the reappraisement case of the J. S. Johnson Co., I have the honor to report how the
various items appearing in said tabulation were obtained.

### UNITED STATES SELLING PRICES.

  Mr. William H. Smith, vice president of the J. S. Johnson Co., submitted the sales
book of his firm following my request, from which book I obtained the following
figures of sales made between June 1, 1914, and November 2, 1914:

No. 10 (gallons), coreless, sliced (6 cans per case):

   1,721 cases, at $3 per case.

     33 cases, at $3.25 per case.

   1,754 cases, at a total of $5,270.25.

  Average price per dozen cans, $6,009

EXPENSES.

(1) *Cans.*—Mr. Smith submitted invoices showing purchases of cans made by his firm at the following prices: No. 10, $45.50 per 1,000, delivered f. o. b. Baltimore or New York.

(2) *Cases.*—Mr. Smith likewise produced invoices covering purchases of cases at the following prices: No. 10, 13½ cents each, delivered f. o. b. Baltimore or New York.

(3) ˙Ocean freight on cans and cases, from Baltimore or New York to Nassau. I saw a duplicate bill of lading showing a freight charge for a shipment of cans and cases which figured down to 8½ cents per case.

(4) Marine insurance on cans and cases going to Nassau. Mr. Smith stated that his firm paid 1½ per cent on their value, but he was unable to submit documentary evidence, owing to the fact that the insurance was covered by the Nassau office of his firm.

(5) Drayage from factory to wharf at Nassau. Mr. Smith testified at the hearing in this case that his firm paid 1 cent per case for drayage.

(6) Ocean freight on the finished product, from Nassau to New York, 10½ cents per case, as per Mr. Smith's testimony at the hearing.

(7) Marine insurance on the finished product, from Nassau to New York, one-fourth per cent of the value, as per Mr. Smith's testimony at the hearing.

(8) Drayage in New York, from wharf to cars, 2 cents per case in Manhattan, 3 cents per case in Brooklyn, as per Mr. Smith's testimony at the hearing.

(9) *Cash discount.*—I found that all these goods were sold subject to 1½ per cent cash discount, and while not every customer avails himself of this discount, I allowed it in the tabulation.

(10) Loss on account of swells and leaks, 2½ per cent of the selling prices. Mr. Smith stated that he was unable to submit figures covering the sales made between June 1, 1914, and November 2, 1914, since this loss was in some cases not claimed until long after the respective sales had been made, and could therefore not·be accurately determined at this time. In a previous reappraisement case of this firm the loss was figured at 2½ per cent and was based upon the complete figures of the business done in 1911 and 1912. I therefore made the same allowance in this tabulation.

(11) Brokerage is a commission paid to the selling agents of the firm. I could not obtain the complete figures for this season owing to the fact that a great part of the merchandise under consideration is as yet unsold. I therefore adopted the same rate as allowed in the former case, viz, 1⅛ per cent, which was likewise based upon the business done in 1911 and 1912.

Exhibits C and D likewise referred to in the stipulation are as follows:

EXHIBIT C.

Board of United States General Appraisers.
Before General Appraiser WAITE.

In the matter of reappraisement Nos. 75118, 75690, 75688, 75689, 75691, 75743, 75711, and 75909 of J. S. Johnson & Co. Pineapples in cans from Nassau, Bahamas.

It is hereby stipulated and agreed that the annexed letter marked B, showing the wholesale United States selling prices of pineapples in cans imported and sold by J. S. Johnson & Co., and certain charges and expenses incidental thereto, was prepared after an examination of the books of said J. S. Johnson & Co., and that the items appearing therein are true and correct and accurately represent the American selling prices of the merchandise in a canned condition covered by the invoices in the above reappraisements.

JOHN R. RAFTER,
*Attorney for Government.*
WALDEN & WEBSTER,
*Attorneys for Importer*

Dated NOVEMBER 9, 1914.

EXHIBIT D.

*Statement of cost of production furnished by J. S. Johnson Co.*

Pineapples in tins.  Reappraisement No. 75690, S. S. Vigilancia, June 18, 1914. Entry No. 189095.

Merchandise: Gallons coreless sliced, 30 lbs. to case; 6 tins to case.

Per case invoice figures: Fruit at $2_{10}^{9}$c. a lb., 88c.; labor, .07c.; general expenses, 10%. .095; profit, 8%, .083; total, $1.128.

Cost figures at end of season: Fruit at $3\frac{1}{3}$ c. a lb., $1; labor, .105; general expenses, 10%, .11; profit, 8%, .097; total, $1.31.

In addition thereto this record discloses that there was before the reappraisement board at the time of rendition of decision the testimony in reappraisement proceeding 75118, 75690, etc., giving the price at which similar merchandise has been sold in the markets in competition with the goods of these importers.  So that it appears that at the time of the rendition of the contested decision of the reappraisement board evidence in due form was before them, as follows:

1. As to the cost of production of the J. S. Johnson Co.'s goods.

2. As to the New York selling price of the J. S. Johnson Co.'s goods.

3. As to the New York selling price of goods similar to those of the J. S. Johnson Co.

That we may be clear as to the two records, it may be well to repeat, that after the earlier decision by this court importers petitioned for a rehearing in part upon the grounds, that *all* of the record before the reappraisement board not being before the court, on further hearing they might be able to show irregularity of procedure. This, however, they have, in our opinion, failed to do.  No new thing has been shown establishing void procedure, and, sufficient evidence was and is in the record to support the reappraisement board's findings.  This record, however, does much more clearly establish exactly what evidence was before each, the single general appraiser and the Board of General Appraisers, on appeal.

The classification board reached the conclusion that the board of reappraisement had predicated its decision upon the evidence relating to the sale prices of the particular merchandise in this country solely from the fact that its conclusion coincided perfectly with the results in the tabulated statement "A" in said stipulation.

The majority of the board held that as a matter of statutory law the words "consigned for sale in the United States" in paragraph L, supra, had reference only to cases where the consignment was made to an "agent" of the consignor; and, inasmuch as this merchandise was shipped by the exporting firm to itself in New York, that such a transaction was without the terms of the last provision of said paragraph L.  The classification board concluded therefrom that the latter part of paragraph L was not applicable in this case, and

for that reason that the reappraisement proceeding was without authority of law and void. The Government appeals.

The first question of law presented, then, is, Are the goods manufactured in Bahama by the Johnson Co. of New York and shipped to themselves from Bahama to New York, goods "consigned for sale in the United States" within that term as used in paragraph L of Section III of the tariff act of 1913? Importers contend as stated that that term as here used refers only to consignments from principal to an "agent." It seems to the court that the act itself read in its entirety completely refutes this contention. The whole customs administrative legislation is a uniform concept phrased to cover two classes of importations—in brief—"purchased" and "consigned" goods. Thus, paragraph C of Section III, providing the currency in which invoices shall be made out, provides for such upon importations "if purchased, or agreed to be purchased," and those "procured otherwise than by purchase," Congress assuming that when these two classes of goods are provided for *all* classes of importations are covered. Paragraphs D and E observe the same differentiations.

Paragraph E, after prescribing what these two classes of pro forma invoices shall contain, requires that they be verified by "the owner, importer, consignee, or agent." If Congress deemed consignment could be had to an "agent" *only* the word consignee herein is surplusage. The reiterated use of these words in paragraphs F, G, and H supports this conclusion. Paragraph I witnesses the same congressional differentiations. In providing that addition or deduction to invoice value can be made on entry (this provision herein being extended to consigned as well as purchased goods) Congress speaks of them "whether the same has been actually purchased or procured otherwise than by purchase," predicating thereof that the "owner, consignee, or agent" thereof may so enter them, evidently deeming consignees and agents may not be the same.

Paragraph J would seem of itself to conclude this question. Because so instructive, we quote therefrom as follows:

J. That when merchandise entered for customs duty has been consigned for sale by or on account of the manufacturer thereof to a person, agent, partner, or consignee in the United States, such person, agent, partner, or consignee shall, at the time of the entry of such merchandise, present to the collector of customs at the port where such entry is made, as a part of such entry, and in addition to the certified invoice or statement in the form of an invoice required by law, a statement signed by such manufacturer, declaring the cost of production of such merchandise, such cost to include all the elements of cost as stated in paragraph L of this act. When merchandise entered for customs duty has been consigned for sale by or on account of a person other than the manufacturer of such merchandise, to a person, agent, partner, or consignee in the United States, such person, agent, partner, or consignee shall at the time of the entry of such merchandise present to the collector of customs at the port where such entry is made, as a part of such entry, a statement signed by the consignor thereof, declaring that the merchandise was actually purchased by him

or for his account, and showing the time when, the place where, and from whom· he purchased the merchandise, and in detail the price he paid for the same:  *  *  *

It treats of goods "consigned for sale" in this country, and names· those to whom, in the congressional concept, such consignments may be made.   They are to "a person, agent, partner, or consignee in the· United States."   Congress deemed, therefore, goods could be consigned for sale in the United States not alone to an "agent" but also to a "person," or "partner," or any other "consignee."

In paragraph J Congress divides *all* consigned merchandise for the purpose of separate legislative treatment into that by a "manufacturer" and a person "other than the manufacturer."   Having thus covered all ·kinds of importations, invoices, and declarations paragraphs K and L prescribe the statutory requirements as to appraisement according as the goods are purchased or consigned. Paragraph K.·prescribes the duty of appraisers as to *all* imported goods.   Paragraph L prescribes substitute methods of determining market value where none such exists in the country of exportation. The first part of the paragraph relates to cases where there *may be* a foreign market value, but which can not be ascertained "to the satisfaction of the appraising officer."   In such cases he may resort in a prescribed way to the cost of production which is declared by statute a minimum of appraised value.   The second part of the paragraph relates to cases where there is *no* foreign market value. In such cases "imported merchandise which is consigned for sale in the United States," etc., "*shall not in any case be appraised at less* than the wholesale price at which *such* or *similar imported merchandise* is actually sold or freely offered for sale in usual.wholesale quantities in the United States in the open market," etc.   Since Congress in paragraph J has. declared that merchandise in this legislative concept can be "consigned for sale  *  *  *  to a person, agent, partner, or consignee *in the United States*," we can find no warrant to read into the same words "consigned for sale in the United States" in the same act a limitation confining . such to consignments to "agents" only.   [Italics ours.]

The court is of the view that by these administrative provisions Congress legislated with reference to two general classes of importations—purchased and consigned—and that either and both is .contemplated as being invoiced, entered, and appraised with the distinctions prescribed by Congress as purchased goods and consigned goods ("goods acquired other than by purchase") whether purchased by or consigned to the "owner," "agent," "consignee," "partner," or any "person."

The provision authorizing appraising officers to resort to home market value or sale price is the same as prescribed in the tariff act of 1909, subsection 11 of section 28.   In this form it differs from

that provided by the customs administrative act as amended in 1897, section 11. Therein it was provided:

SEC. 11. * * * It shall be lawful for appraising officers, in determining the dutiable value of such merchandise, to take into consideration the wholesale price at which such or similar merchandise is sold or offered for sale in the United States, due allowance being made for estimated duties thereon, the cost of transportation, insurance, and other necessary expenses from the place of shipment to the United States, and a reasonable commission, if any has been paid, not exceeding 6 per centum.

In Beer v. United States (1 Ct. Cust. Appls., 484; T. D. 31526), that provision of the act of 1890 as amended in 1897 was reviewed by this court and it was held that it could be exercised according to the discretion of appraising officers regardless of the existence of any foreign market value for the particular merchandise. That decision, however, was rendered April 17, 1911, after the act of 1909 had gone into effect. The provision as it then and now appears is couched in vastly different language. Instead of being an authorized method of appraisement it is here made a mandatory minimum as to all importations falling therewithin. Its exercise, therefore, by appraising officers in the presence of consigned and goods sold for export only where there is no foreign market value of such goods, as a minimum, is not only authorized but mandatory. It being stipulated and conceded by all parties in this case that there is not a semblance of foreign market value in the country of production for these importations, the duty of the board to at least take into consideration and test this appraisement by the price at which such or similar merchandise is sold in this country as by paragraph L provided needs no argument.

Even were it not so made mandatory by the statute that appraisers duly take into consideration domestic market value, when such is authorized, as by the act of 1890 as amended in 1897, its exercise by such officers or boards thereof is not reviewable by the courts.

The decision in the Beer case, supra, by this court is amply supported in this particular by two decisions of the Supreme Court of the United States here applicable. In Stairs et al. v. Peaslee (18 How., 59 U. S., 521, 527), the Supreme Court held that what is the "principal market" of a country is a question of fact in an appraisement proceeding the determination of which by the appraisement officers is conclusive and not reviewable by the courts. That principle was followed and applied by the Supreme Court in Muser v. Magone (155 U. S., 240, 248). There it was urged that there was no market value for certain laces in St. Gall. It was shown that the appraisers had adopted a method known as the "stitch rate," whereby from certain *facts* they deduced market value and that in consequence there was *a* market value for such at St. Gall. The Supreme Court ruled that the determination by the appraisers of

*the fact of a market value* was conclusive upon the courts, saying: "We must assume that the conclusion of the appraisers was that the market value *could be ascertained to their satisfaction*, and such determination is binding." Stairs *v.* Peaslee (18 How., 521). [Italics ours.]

The included question is raised in this case whether the phrase, in paragraph L, "the wholesale price at which such or similar imported merchandise is actually sold or freely offered for sale in usual wholesale quantities in the United States in the open market," etc., confines the inquiry to the sale of the identical merchandise, only, first to be considered; and, in the absence of such proof, and then only and not before that consideration may be had of proof of sales of similar merchandise. The court is of the opinion that the word "such" means "identical" and that the phrase is to be. construed as defining domestic market value, and what may be accepted as evidence thereof and defining by law the scope of that inquiry. The phrase is the same as that used to define "market value" and "wholesale price" in paragraph R of the same act, as follows:

R. * * * That the words "value," or "actual market value," or "wholesale price," whenever used in this act, or in any law relating to the appraisement of imported merchandise, shall be construed to be the actual market value or wholesale price of such, or similar merchandise comparable in value therewith, as defined in this act.

Each is a definition of wholesale market value. the one foreign and the other domestic. Each authorizes that in arriving thereat appraising officers may not only take into consideration sales of the very merchandise imported but sales of similar merchandise.

Inasmuch as the domestic sale price of "such," the identical, merchandise is made evidence of the foreign market value in these cases, and "such" never exists until the particular importation thereof is complete and sale made, the contention that only such domestic sales as were made *at the time of exportation* could be considered by appraising officers seems disposed of by the statute itself. The thing to be determined is "market value" at the time of exportation, but in the absence of such Congress has prescribed how, with possibly later evidence only, appraising officers may *constructively* determine such market value.

There was before the board, then, evidence of the cost of production of this merchandise; evidence as to the sale price thereof in this country; and evidence as to the sales of similar merchandise in this country. Of this evidence and the weight to be given the same and every part thereof the board of appraisers were the sole judges. Whatever method of appraisement prescribed by the statute was adopted by them, cost of production, sale price of the identical merchandise or sale price of similar goods, was supported by *some* substantial evidence. That concludes the case. Whether or not all

the evidence considered by the board is here shown becomes immaterial, it being shown that some substantial evidence supports their decision, whatever method adopted by them, and it not being shown that they in anywise proceeded contrary to or without authority of the statute. With such a record before them the case is ruled by the case of Wolff *v.* United States. (1 Ct. Cust. Appls., 181, 186; T. D. 31217), wherein we said:

> To permit of a review of a decision of the appraisers on the ground that it was erroneous, that it was mistaken, that it was incorrect, that it was induced by a wrong conception of the facts, that the appraisers had not used good judgment, that they ignored facts which they should have considered or gave weight to evidence which should have been excluded, would overturn the whole system so carefully and wisely elaborated by Congress for the determination of values and the prompt collection of customs duties. Inquiry into value and the methods of reaching it must end somewhere, and when Congress decided that it should end with an appeal to the Board of General Appraisers sitting as a reappraisement board, its wishes in that behalf should be respected, especially as a judicial revision could afford no higher guaranties of a flawless judgment, no better security for a decision free from error, than does that of the system which the legislature saw fit to establish. Evidence that appraising officers were careless, or even irregular, in the performance of their duties falls short of showing that they *assumed powers not conferred on them by the statute,* and their valuation can not be impeached by evidence of that character. Neither is it competent to inquire as to whether the appraisers followed or disregarded the evidence produced before them. Hilton *v.* Merritt (110 U. S., 97, 107); Auffmordt *v.* Hedden (137 U. S., 310, 325). [Italics ours.]

*Reversed.*