SABINE TRANSPORTATION CO., INC., ET AL. *v.* UNITED STATES

No. 4409.—Invoices dated Hannover, Germany, September 19, March 1, 1935.
Certified September 24, March 2, 1935.
Entered at Galveston, Tex., November 16, April 26, 1935.
Entry Nos. 56, 146

(Decided October 11, 1938)

*W. Clint Little* for the plaintiffs.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph E. Weil* and *Daniel I. Auster,* special attorneys), for the defendant.

EVANS, Judge: These are appeals from a finding of value by the United States appraiser upon importations of steel wire rope imported from Germany and entered at the port of Galveston, Tex. The rope was entered at the invoice values in United States dollars per 100 feet less certain nondutiable charges, which values the importers, the plaintiffs herein, claim to be the dutiable value and the export value. The appraiser found the proper values to be the foreign-market values, which he found to be higher than the export values.

When the cases were called for trial they were consolidated and the importers called to the stand Mr. D. J. MacGregor, who stated that he was the acting appraiser at the port of entry. We quote his testimony in full as follows:

Direct examination by Mr. LITTLE:

Q. Your name is MacGregor?—A. Yes, sir.
Q. By whom are you employed, Mr. MacGregor?—A. By the U. S. Customs.

Q. What is your official capacity?—A. Acting appraiser.

Q. Then, in your official capacity as acting appraiser, I presume that you examined and appraised the merchandise covered by these two entries?—A. Yes, sir.

Mr. LITTLE. I presume that these are in evidence before the court, but, as a matter of record, I would like to introduce them.

Judge EVANS. They are part of the record.

By Mr. LITTLE:

Q. Mr. MacGregor, from these entries here, is there any designation as to which packages you should examine? Did the collector make any designation on those invoices as to which packages you should examine?—A. Examine on the wharf.

Q. Did he designate any packages?—A. No; all the packages.

Q. Is that on the invoice there? Did he designate all the packages?—A. Well, it says "Examine on the wharf."

Q. There is a place here, I believe, "Place of examination," and that stamp, as I understand it, is placed there over that "Place of examination." Up here there is "Packages to be examined." Are there any figures in that place there by the collector to show which packages were to be examined?—A. No.

Q. How much of this merchandise did you examine, Mr. MacGregor?—A. I examined it all.

Q. You examined it all? Did you weigh this merchandise?—A. No.

Q. Did you cause the merchandise to be weighed?—A. No.

Q. Did you measure how long any one of these ropes was?—A. No.

Q. Did you measure the diameter of any of the ropes?—A. No.

Q. Did you measure the strand of any rope?—A. No.

Q. Or the diameter of any wire in any strand?—A. No.

Q. Did you take or keep any samples of this rope?—A. No.

Mr. WEIL. That is objected to as immaterial.

Judge EVANS. I don't know what the point of it was. Objection sustained.

Mr. LITTLE. Exception.

By Mr. LITTLE:

Q. How long after this merchandise was released before the appraisement was made?

Mr. WEIL. That is objected to as immaterial, irrelevant, and incompetent.

Judge EVANS. How is it material?

Mr. LITTLE. I don't know that it is material.

Judge EVANS. Objection sustained. Wait a moment. I think the summary will show the date of appraisement. It ought to be there, an order of release in the record.

Go ahead.

By Mr. LITTLE:

Q. What basis did you use for determining your appraisement? Did you use the home market value, the foreign market value, the export value, or——A. I based it on the report of the Treasury Representatives in Europe.

Q. In that report, did it state that it was the home market value or the export value?—A. It stated that it was the home market value.

Q. Home market value? I will ask you again to refer to that, and ask you if there is any indication on any of those invoices as to the basis used by you in determining your appraisement?

Mr. WEIL. That is objected to.

Judge EVANS. That is, whether it was foreign, export, or what value?

Mr. LITTLE. Yes.

Judge EVANS. Objection overruled.

Mr. WEIL. Exception.

Judge EVANS. You may answer.

The WITNESS. What was the question?

By Mr. LITTLE:

Q. Is there anything to indicate what method you used in arriving at that value, or what value you used, whether it was home market value or export value?—A. It was home market value, on the basis of the report.

Q. Is there anything to indicate, on your return, that it was home market value? Did you mark it anywhere on your return to indicate that it was home market value?

Mr. WEIL. Objected to on the ground that there is no necessity; it is wholly immaterial.

Judge EVANS. If it is on there, it will show.

The WITNESS. Just "Appraised value."

By Mr. LITTLE:

Q. It is not on there, and just the appraised value. I will ask you to explain in detail the operations you went through in arriving at this figure.—A. You mean the appraised value?

Q. Yes.—A. The report stated specifically each item, and it was the value at Reichsmarks per kilo, and the invoice was in dollars per hundred feet; and I appraised in dollars, on the basis of the report.

Q. What rate of exchange did you use, Mr. MacGregor, in making this conversion, and making this into feet, into dollars per hundred feet rather than Reichsmarks per hundred kilos? What rate of exchange did you use?—A. The rate stated by the liquidator.

Q. Did you recall what that rate was?—A. Well, there were two rates.

Q. What were the rates?

Judge EVANS. If you can't remember, you can refresh your memory from anything you have before you.

The WITNESS. (After consulting papers) On Entry No. 146 it was .40725. On Entry No. 56 it was .4023.

By Mr. LITTLE:

Q. Do you know what was the proclaimed rate for that quarter?—A. I presume this was the proclaimed rate.

Q. You do not know of your own knowledge what the rate was?—A. I don't know.

Q. I believe you stated a few moments ago that the rope in the German market was sold in Reichsmarks per hundred kilos; is that correct?—A. I don't know whether it was per hundred or per kilo. At any rate, it was sold per kilo, Reichsmarks per kilos.

Q. You accepted, then, the invoice description of the number of reels, and of the length of the ropes, but you did not accept the invoice description of the weight of the rope, in making your conversion; is that correct?

Mr. WEIL. I object; this isn't his testimony as to the weight of the rope.

Judge EVANS. The question is interrogation on that line; objection overruled.

Mr. WEIL. Exception.

By Mr. LITTLE:

Q. You accepted the invoice description of the length, and also the number of reels, but you refused to accept the invoice description of the weight as used in making your conversion, did you not?

## 644

Mr. WEIL. That is objected to; there is nothing in the record to indicate that.

Judge EVANS. Well, you mean the weight of the rope, or do you mean he refused to use the unit of weight in his appraisement?

Mr. LITTLE. I mean the weight of the rope.

Judge EVANS. The actual weight of the rope?

Mr. LITTLE. Either the weight of the rope or the unit, actual weight of the rope as shown by the invoice.

By Judge EVANS:

Q. How did you determine the weight of the rope?—A. It was all stated in the report.

Q. Oh, you used the weight stated in the report?—A. Yes.

By Mr. LITTLE:

Q. Then I will ask you whether or not you compared the weight as shown in the report with the weight as shown by the invoice?—A. No.

Judge EVANS. He is required to appraise at the unit in which the merchandise is purchased. If it is purchased in kilos, he wouldn't appraise for the total weight on the invoice, would appraise it per unit.

Mr. LITTLE. The point I am trying to make is that the weight, when you figure the weight that he used and the average actual weight, there is quite a discrepancy.

Judge EVANS. Well, he wouldn't have anything to do with the total amounts of duty; all he does is appraise at the unit of entry, that is, at so much per kilo, if kilo is the unit. Now, whoever multiplies it extends it. That is not his job.

Mr. LITTLE. I see.

Judge EVANS. As I understand it.

Mr. LITTLE. I believe that is all.

Judge EVANS. If he should appraise total amounts, he would be making a invalid appraisement, in my judgment, under the law.

Cross-examination by Mr. WEIL:

X Q. Did you accept the diameter and size as they appeared on the invoice?—A. Yes, sir.

X Q. And wasn't the conversion based on the proclaimed rate at the date of exportation, as promulgated by the Treasury Department?—A. Yes, sir.

X Q. Wasn't that the conversion rate you accepted?—A. Yes, sir.

X Q. You testified that you based your appraisement upon a Treasury Report?—A. Yes, sir.

X Q. Will you please look through your file and see if that report is dated August 9, 1935?—A. Yes, sir.

X Q. And the report of Paul Hermes, Assistant Treasury Attaché, and forwarded by Erwin G. May, the Treasury Attaché; is that the report that you have?—A. Yes, sir.

X Q. Containing the various prices and copies of invoices or sales?—A. Yes, sir.

X Q. Is your report numbered 79/35–A?—A. Yes, sir.

X Q. And 117/35–A?—A. Yes, sir.

Mr. WEIL. I offer these reports in evidence.

Mr. LITTLE. I am going to object to them being offered in evidence as to 112526–A, because these reports were made before the shipment of rope was ever made to this country. The shipment of rope was not made until September 19, 1935, and the report is dated August 9, 1935. And, further, I am going to object to these reports on the ground that they are incompetent. They are full of conclusions, and they are incorrect.

Judge Evans. Of course, they are made admissible by statute. They may be admitted.

Mr. Little. I understand that these objections are a matter of record.

Judge Evans. The conclusions will not have any effect with the court. As to the fact that the report was prepared before the importation, I think I would have to compare the record and check on that.

Mr. Weil. I respectfully submit that the report may have been prepared prior to the date of exportation, yet, at the same time, the information contained therein may be so approximate to the time, as to the date of exportation, that it will be given weight and materiality as the court sees fit.

Judge Evans. I will reserve a ruling on that. If it is adverse, you will have an exception.

(The document referred to was received in evidence and marked Exhibit 1, Reappraisements 112526–A, etc., of this date.)

By Mr. Weil:

X Q. Well, did you personally make the conversion of currency from Reichsmarks to American dollars?—A. Yes, sir.

X Q. You did?—A. Yes, sir.

X Q. And not the collector's office?—A. The liquidator stated it to me.

X Q. Oh, he stated it to you, and you made it?—A. Yes, sir.

X Q. What was the liquidator's name?—A. Mr. Baker.

Mr. Weil. That is all.

Mr. Little. That is all. I would like to call Mr. Munger T. Ball.

Mr. M. T. Ball, general manager of the importing company, was next called. He stated that he bought the merchandise in question from A. P. Schuller & Sohn through their local representative, R. E. Weems; that he had been doing business with this firm for over ten years. He further stated that the amount on the invoice represented the actual amount he had paid, and in support of that, produced Collective Exhibit 2, a sight draft drawn by P. Schuller & Sohn at Hanover, Germany, on March 5, 1935, together with a receipt from said firm dated October 5, 1935, showing an amount of $1,712.85. The importer also offered and there were received in evidence two affidavits (Exhibits 3 and 4) executed in Germany, the first of which undoubtedly is based on hearsay statements, but it is such statements as business men rely upon in their daily transactions, that is, reports of inferiors. Because of its hearsay character it should be and hereby is rejected. The second affidavit (Exhibit 4) was made by Mr. E. Wolf, partner in the firm that manufactured the particular rope in question. He gives an analysis of the sizes and weights of the shipments involved in the invoice dated March 1, 1935, covered by reappraisement 112527–A. He further states therein:

The price of wire rope in the German market is based on the size of the wires and the list price is based on price per hundred kilos. This price is set by the Deutsche Drahtseil-Ausfuhr-Vereinigung (German Wire Rope Export Combine) and all shipments are checked by them and this particular shipment has been examined and worked by the Labour Bureau and Price Committee of this union and approved by them and in shipments of this size the following rates of discount off the list prices prevail:

There is first to be taken a discount of twenty percent (20%) and five percent (5%) in chain discount; then there is to be allowed RM. 1.50 per 100 kilos, freight allowance, and an added discount of two percent (2%) for cash payment.

Mr. Wolf gives a schedule of what he designates "a part of the price list for the home market value" so far as it pertains to this shipment (March 1, 1935). These prices check against Exhibit A attached to the special agent's report (Exhibit 1) as per the column "Galv. Steel Wire 140 kg. per sq. mm." Mr. Wolf's affidavit further asserts that the home market value is not higher than the prices charged in the instant invoice, and that the discounts allowed were the usual and customary discounts allowed in the home market to the usual wholesale buyers.

The Government offered a special agent's report which was accompanied by six copies of purported invoices of sales in the home market. The copies of invoices cannot be received because they are all in the German language. The report itself will be received in evidence as Exhibit 1. The special agent states that all sales of steel wire rope for home consumption in Germany are made by the Drahtseilverband, a sales syndicate formed by the German manufacturers of steel wire ropes, with offices at Essen and Berlin, and that the data regarding the foreign value was obtained from the Berlin office. He attached a pricelist issued by the selling agency which list he states has been in effect since January 1, 1935, and the prices given thereon are subject to a trade discount of 17½ per centum.

He further states:

\* \* \* the syndicate sells the wire ropes on the basis of the gauge and the quality of the wire entering into the manufacture of the ropes, regardless of construction. The list prices are in Reichmark per 100 kg. gross for net, packed in oilpaper and burlap, this kind of packing being included in the prices. The cost of reels, if ordered, is charged extra. All deliveries are made direct from the various works freight prepaid to the buyer's nearest railroad station. The syndicate makes no sales ex works and it quotes no prices on this basis.

(2) *Restriction on Resale.* The syndicate is aiming to force the dealers to resell at the prices fixed by it. The Berlin office informs me that the syndicate has obtained a number of signed agreements from German dealers which bind them to resell at such fixed prices, but that it has been unable so far to obtain the signatures of numerous other dealers, who are, consequently, at liberty to resell at their own prices. The syndicate is not in a position, I am further informed, to force the dealers to sign such agreements and it continues to sell to such dealers notwithstanding their failure to sign the agreement.

He further advises that sales of steel wire rope for home consumption are subject to a turnover tax of 2 per centum which tax does not apply to sales for export, and that there are no other taxes on export.

He appends to his report a "Table Showing foreign Value of Types Involved."

The first tabulation on this page of his report designated case 79/35 has no relation to any of the importations involved herein. Appar-

ently the second tabulation, case 117/35, has reference to the invoice covered by reappraisement 112527–A, because the quantities and diameters correspond. Furthermore, the special agent's designation of the number of strands involved corresponds to Mr. Wolf's affidavit in that respect. For instance, Mr. Wolf's affidavit gives the first item ⅜-inch rope as being composed of 6 strands of 42 wires and 7 hc. Seven hc. I understand refers to 7 hemp cords, each of the 6 strands being, as I understand it, wrapped around a hemp core and the whole 6 wrapped around an additional core, which makes 7 in all. There is a slight difference in the higher diameters. In the 2-inch diameter rope the special agent's report gives the diameter as 2.4 in mm., but the same was composed of 6 strands of 37 wires and 1 hemp core. Mr. Wolf's report states that the 2-inch rope was made up of 6 strands of 37 wires and 1 hemp core.

There is nothing in the evidence that states that the importation was wire of crucible strength having a breaking strength of 130–140 kg. per square mm, although Mr. Wolf's report in stating a price has a heading of 140 kg. per sq. mm. The pricelist appended to the special agent's report is headed in the same manner as Wolf's report, that is 140 kg. per sq. mm.

The acting appraiser was recalled and was asked this very leading question:

Q. Mr. McGregor, in appraising the merchandise, did you use the unit of quantity in which the merchandise is usually bought and sold, by ascertaining or estimating the value thereof by all reasonable ways and means in your power?

To this he answered "Yes, sir." In view of his detailed description of what he did toward examining the merchandise, I submit that this conclusion can have very little weight.

He further stated that the unit of quantity of his appraisement was the unit stated in the invoice; that he did not appraise the merchandise in the currency of the country of exportation, and that he did not show on any of the papers whether his value was foreign-market, export, or United States value. On redirect examination he stated that he appraised in dollars on the basis of the foreign report (presumably the special agent's report).

The importer moved to have the appraisement declared null and void and that the entered value be declared the dutiable value. The grounds for the motion are stated in the record as follows:

First, because the collector failed to designate the packages, or any package, for examination, as required by section 499 of the Tariff Act of 1930. On numerous occasions this court has held that function to be mandatory on the part of the collector, and without which there can be no legal and valid appraisement. Therefore the collector may assess duty on the entered value. We could give you a citation, *United States* v. *V. W. Davis, Sinai Kosher Sausage Factory*, 20 C. C. P. A. 305, T. D. 46087; *United States* v. *F. W. Woolworth Co. et al*, 22

C. C. P. A. 184, T. D. 47126; *United States* v. *C. J. Tower & Sons*, Reappraisement 3858; and also *United States* v. *C. J. Tower & Sons*, T. D. 46943. Here in this last case the court was speaking of the necessity for the collector to designate, and said "This rule is so well settled that further reference to the authorities is unnecessary." Then there is nothing on the invoice to indicate the collector designated any packages. The appraiser confirmed that by his testimony.

Second, the appraiser failed to return the value in the unit quantity in which the merchandise is usually bought and sold in the ordinary course of trade as required by Article 778 of the Customs Regulations of 1931, which regulations are authorized and required by section 500 of the Tariff Act of 1930.

Third, the appraiser failed to express the value in the currency of the country of exportation in which merchandise identical with or similar to that under appraisement is usually bought and sold in the ordinary course of trade, as required by the same article, section (*b*), and part of section (*e*), of the Customs Regulations of 1931, which regulations are authorized and required by section 500 of the Tariff Act of 1930.

Fourth, the appraiser invaded the prerogative of the collector by converting the currency and finding a rate of exchange, in violation of Article 778 (*e*) and (*b*) of the Customs Regulations of 1931, which regulations are authorized and required by the said section 500 of the Tariff Act of 1930. And, as said in *United States* v. *Sears Roebuck & Co.*, Reappraisement 3290, "The conversion of currency is a matter entirely within the province of the collector."

Fifth, the appraiser failed to indicate on the invoice the method used in determining the appraised value, as required under Article 778 (*t*) of the Customs Regulations of 1931, which regulations are authorized and required by section 500 of the Tariff Act of 1930.

Excellent briefs were submitted by both parties. In order to have the record clearly present what the summary of entered value, examination, and appraisement shows in each of the reappraisements I have had a photostatic copy made of the one covered by reappraisement 162527–A and am making it a part of this decision. Appendix A. This form (customs Form No. 6417) is prescribed by the Treasury Department for use by the collector and appraiser. It will be observed that in the upper right-hand square there is a printed notation "Packages to be examined," below that a line for "Place of examination," and below that a place for the signature of the collector or the person acting for him. Undoubtedly it was the intention of the Department in preparing this form to provide a simple plan and easily executed method of complying with the statute which relates to the examination and appraisement of merchandise. Section 499 of the Tariff Act of 1930 governing this case on the question of designation and examination of merchandise is as follows:

The collector shall *designate the packages or quantities* * * * which are *to be opened and examined* for the purpose of appraisement or otherwise and shall order such packages or quantities to be sent to the public stores *or other places* for such purpose.

This section is identical with section 499 of the Tariff Act of 1922. The Customs Regulations of 1931, article 771, provide that customs Form 6417 with the invoice attached shall be deemed the order of

## CONSUMPTION ENTRY No. 1⁷ APR 26 1935

## SUMMARY OF ENTERED VALUE, EXAMINATION, AND APPRAISEMENT
### (TO BE ATTACHED TO INVOICE)

| RATES | | PACKAGES TO BE EXAMINED |
|---|---|---|

**UNITED STATES CUSTOMS SERVICE**

District No. 22

Port of **G a l v e s t o n,** APR 26 1935 , 193

I hereby certify that this invoice (No. 256 ) was presented this day on entry.

| | |
|---|---|
| Invoice value | $3598.80 |

ur 316a

35%

| | |
|---|---|
| Less nondutiable charges | 464.04 |
| Add dutiable charges | |
| Add to prices to make market value | |
| (Specifications attached.) | |
| Deduct from prices to make market value | |
| (Specifications attached.) | |
| Net entered value | $3134.76 |

Vessel or carrier **American ss WEST HOBOMAC**

Collector's Office **G a l v e s t o n**

**EXAMINE ON WHARF**

(Place of examination)

FRED C. FABST
Collector of Customs

By _____
Acting Deputy Collector.

_____ Feb 13 _____, 1936 The examination and appraisement of the merchandise covered by this invoice has been made in accordance with the law, and the facts as found are set forth below.

(A check mark (✓) indicates that appraisement, classification, or quantities are as entered or that packing charges are believed to be correct.)

| Marks. | Numbers. | Examiner and date of examination. | Appraised. | Advisorily Classified. | Quantities. | Dutiable packing charges. | Remarks. |
|---|---|---|---|---|---|---|---|
| ✓ | ✓ | 4-27-36 | as noted | ✓ | ✓ | ✓ | |

_____
Appraiser.

_____
Acting Appraiser.

ABBREVIATIONS.—Correct, "C"; advanced, "Adv."; reduced, "Red."; rate advanced, "R. A."; rate reduced, "R. R."; excess quantity, "E"; shortage in quantity, "S"; not legally marked, "N. L. M."; importer's certified value, "I. C. V."; warehouse, "W"; prohibited, "P."

Appendix A

appraisement and then quote the section in question (499). Undoubtedly it was the firm intention of the Treasury Department in prescribing this form that the collector under the title "Packages to be Examined" should designate by some convenient method the identical packages to be examined and opened. This in compliance with the provisions of the statute. It also was undoubtedly the intention that he should designate where the examination was to be made. Does the mere placing of the rubber stamp over the line "Place of examination" comply with the mandatory language contained in said section 499? On that point the language of the court in the case of *Central Vermont Railway Co.* v. *United States*, Reap. Dec. 4010, is apropos. There it was stated:

Whether or not the merchandise was examined by the appraiser or his subordinates, however, the fact remains that no designations were made as required by the provisions of section 499, supra, and the applicable customs regulations. This was fatal to appraisement made under either the Tariff Act of 1922 or the Antidumping Act of 1921, and the appraisements claimed to have been made under such circumstances must be held to be void. (Citing cases.)

In discussing the *Central Vermont* case, *supra*, the Government attorney in his brief states:

In that case it was conceded that there was *no designation* whatsoever. In the instant case, there was a designation to "examine on wharf" which the examiner interpreted as a designation of *all* cases to be examined at the wharf, which as hereinbefore indicated, was concededly done. Therefore the *Central Vermont* case, *supra*, does not control the issue herein. Therefore, we contend that the acceptance by the collector of the appraised value carries with it a ratification of the examination of all the packages.

There are two designations that the collector must make: (1) The number of packages that must be opened and examined and (2) the place at which this duty shall be performed. Clearly the collector designated the place of examination, and the argument that he has ratified such examination as the appraiser made is an admission that he failed to designate the number of packages to be opened and examined.

On the question of ratification Government counsel cites the case of *United States* v. *Boston Paper Board Co.*, 23 C. C. P. A. 372, T. D. 48233, and quotes therefrom the following paragraph at page 377:

It is insisted, however, that inasmuch as it is established that 7 packages of the merchandise were examined by the appraising officers, the defect in the designation by the collector of only 2 packages was cured. Had the collector accepted the appraisement made and liquidated the entry accordingly, this argument might be made with some plausibility; but he did not. His attempted liquidation of the entry prior to the expiration of the time for appeal to reappraisement was properly held by the trial court and the division to be null and void, and therefore there was no official act of the collector accepting the examination and appraisement of 7 packages. His only valid official act subsequent to the examination and appraisement of the merchandise by the local appraiser was his appeal

to reappraisement. Inasmuch as the liquidation of the collector was void, this question of ratification is not present here, and we express no opinion as to the power of the collector to cure an invalid designation by subsequent ratification of the examination by the appraising officers of a sufficient number of packages to comply with the mandatory provisions of the law.

Government counsel then submits that—

In the instant case, the collector accepted the appraiser's finding of value (no collector's appeal was filed herein) and we contend such acceptance carries with it a ratification of the examination of all packages made by the appraiser.

If the collector *can* ratify or approve an examination made by an appraiser to cure his failure to comply with the statutory requirement, I submit that the doctrine is less applicable in this case than it was in the *Boston Paper Board Co.* case. There, as indicative of his ratification, the collector did cause a liquidation to be made. Certainly that would be an act of ratification. In the instant case the collector took no affirmative action.

The Supreme Court of the United States in the case of *United States* v. *Eugene Beebe, William A. Henshaw et al.*, 180 U. S. 343, at 354, held:

Where an agent has acted without authority, and it is claimed that the principal has thereafter ratified his act, such ratification can only be based upon a full knowledge of all the facts upon which the unauthorized action was taken. This is as true in the case of the government as in that of an individual.

There is absolutely nothing in this case to indicate that the collector knew the character or kind of examination that was made. All that the report indicates with reference to the examination is that the quantities are as entered. I gather that from the fact that the red check mark appears under quantities. There is nothing in the report to show that the examiner did not open any of the packages claimed to have been examined nor that he did not determine the sizes, that is the diameters of the ropes nor the sizes and number of wires in the strand, all of which, according to the evidence, has a bearing upon the value of the merchandise involved. The language of the statute "to open and examine" was undoubtedly inserted therein for the purpose of protecting the Government, and the words should be taken literally. The obligation rests upon the examiner to follow them strictly. It is my opinion no such examination was made in this case as the law requires.

In the case of *United States* v. *V. W. Davis, Sinai Kosher Sausage Factory*, 20 C. C. P. A. 305, T. D. 46087, the Court of Customs and Patent Appeals, speaking through Lenroot, Judge, stated:

We therefore hold that the provisions of said section 499 regarding the designation by the collector of merchandise for examination for purposes of appraisement are mandatory.

I am further of the opinion that the statute does not authorize the appraiser to proceed on his own initiative to examine merchandise not

designated for examination. It may be a technical objection that is here interposed, and if the court had equitable powers it would say it would appear inequitable, had there been a legal examination of all the merchandise, but neither the collector nor the appraiser can act without statutory authority, and when they do act under statutory authority they are bound in their procedure to follow the statute. See *United States* v. *Johnson Co.*, 9 Ct. Cust. Appls. 258, T. D. 38215.

The testimony of a witness for the importer stated that there was very little fluctuation in the price of wire such as he had heretofore bought as compared with the prices at which he entered the instant merchandise. Neither the special agent's report nor Mr. Wolf's affidavit makes reference to the merchandise involved in invoice of September 19, covered by reappraisement 112526-A, but an examination of the items there involved shows that the merchandise was galvanized steel hawsers 2 inches in diameter, having 6 strands of 37 wires each. Both the Wolf affidavit and the special agent's report make reference to 2-inch wire composed of 6 strands of 37 wires. I hold that neither the report nor the affidavit is too remote to be weighed in connection with reappraisement 112526-A.

There are other and valid objections to the attempted appraisement herein which we briefly note. The regulations required an appraisement to be made in the currency of the country of export. The acting appraiser stated that he appraised in United States dollars, the currency of the invoice, according to the special agent's report. Of course the special agent's report gives no United States values for this merchandise. It does assume to give a comparison for merchandise that was imported on another shipment.

Section 500, *supra*, in describing the duties of the appraiser, states:

It shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe * * *.

Under authority of that paragraph the Secretary has promulgated article 778 of the Customs Regulations of 1931, paragraph (*b*) of which states (the excepted portion bearing no relation to the question here in controversy):

(*b*) Except as modified in this article, the value shall be expressed in the currency of the country of exportation in which merchandise identical with or similar to that under appraisement is usually bought and sold in the ordinary course of trade, notwithstanding that two or more currencies of different character may circulate in that country.

This provision was a wise provision of law inserted to safeguard the importer's interest. He is entitled to know and to be able to check on the appraisement. The acting appraiser admitted that, in order to make the appraisement in the manner undertaken, he had to convert the currency given in the special agent's report in order to state a dollar value. Conversion of the currency by statute and regulations

is placed in the collector's hands. Examination of the evidence indicates that this merchandise is bought and sold both for home consumption and for export based on a price in reichsmarks per 100 kg.

The importer's attorney in his brief makes the claim that the appraiser in adopting the weights given in the special agent's report used erroneous and incorrect weights. He asserts that the appraiser had before him a private invoice which gave the true weights. There is no evidence in the case that the appraiser had the private invoice before him but there is evidence now before the court as to the correct weights per hundred meters of the wire shipped on the invoice dated March 1, 1935, and that comparison shows in one instance an underweight, but in five instances an overweight on the special agent's report, running as high for the 2-inch rope as 56 kg. per hundred meters. We set forth below a tabulated comparison taken from the importer's brief and checked by the court.

| Size of rope | Report weight per 100 meters | Invoice weight per 100 meters | Difference per 100 meters |
|---|---|---|---|
| ⅜-inch | 24 | 26 | 2 |
| ⅝-inch | 89 | 79 | 10 |
| ¾-inch | 110 | 108 | 2 |
| ⅞-inch | 159 | 154 | 5 |
| 1-inch | 186 | 186 | 0 |
| 1¾-inch | 707 | 663 | 44 |
| 2-inch | 923 | 867 | 56 |
| ALL WEIGHTS ARE GIVEN IN KILOS PER 100 METERS | | | |

The affidavit of Mr. Wolf also shows a different rate of discount from that reported by the special agent in his report.

The merchandise involved in reappraisement 112526-A, invoice dated September 19, 1935, would undoubtedly show a greater difference in weight since the greater portion of the steel rope on that invoice was 2 inches in diameter, the special agent's report of which was 923 kg. per 100 m. and the actual weight, as per the affidavit of Mr. Wolf, for wire rope of that diameter was 867.48 kg. per 100 m. or a difference, as pointed out above, of 56 kg. per 100 m.

There are other reasons urged against the validity of the appraisement which we do not discuss because these appear to be the more vital ones.

It is my opinion that the appraisement was invalid for failure to designate the number of packages to be opened and examined, for failure to appraise in the unit of quantity in which the merchandise is usually bought and sold, and for failure to appraise in the currency in which the merchandise is usually bought and sold in the country of exportation.

Inasmuch as I have found that the collector failed to designate the packages to be examined, it would seem that the case should be

governed by the finding of the Court of Customs and Patent Appeals in the case of *United States* v. *C. J. Tower & Sons*, 24 C. C. P. A. 456 at 464, T. D. 48912. There the court held in a case where the collector had failed to designate any packages for examination:

In the case of *United States* v. *F. W. Woolworth Co. et al.*, 22 C. C. P. A. (Customs) 184, T. D. 47126, this court held that, under the statute, it is the duty of the single judge upon an appeal to reappraisement, and the duty of the appellate division upon appeal to it, to find value in all cases in which appraisement is required and *in which the elements are present that enable appraisement*. It was recognized that in some cases such elements might not be present and that because of this an anomalous situation must result, which, it may be here added, the courts cannot remedy, however regrettable it may appear. The *Davis, Sinai Kosher Sausage Factory* case, *supra*, was cited as illustrative of such a case. That situation, as the appellate division points out, exists here.

However, in that case the single judge held (Reap. Dec. 3707) that the evidence was insufficient to support a finding as to the correct values of the importations. In that respect the instant case is distinguishable in that here there is evidence upon which the court can find values.

Exhibit 4, the affidavit of Mr. Wolf, corroborates the statement on the bottom of each invoice to the effect that the "Home market value, taxes included, is in no case higher than the invoice price," Mr. Wolf's statement being that "the home market value is no higher than the prices charged the aforesaid *Sabine Transportation Co., Inc.*" In said Exhibit 4 Mr. Wolf gives a true analysis of the sizes and weights of the shipments and also a schedule of pricelists in the home market based on reichsmarks per 100 kg. for wire rope made up of wire of the diameter in mm. involved herein. That schedule shows the following:

The 2-inch diameter rope is made up of wire 2.3 mm. in thickness.
The 1¾-inch diameter rope is made up of wire 2.1 mm. in thickness.
The 1-inch diameter rope is made up of wire 1.4 mm. in thickness.
The ⅞-inch diameter rope is made up of wire 1.2 mm. in thickness
The ¾-inch diameter rope is made up of wire 1.0 mm. in thickness.
The ⅝-inch diameter rope is made up of wire 0.90 mm. in thickness.
The ⅜-inch diameter rope is made up of wire 0.34 mm. in thickness.

The prices in reichsmarks per 100 kg. delivered prepaid, according to this exhibit, are as follows:

| Wire diameter millimeters | Reichsmarks |
|---|---|
| 2.5 | 45.25 |
| 2.1 | 45.25 |
| 1.4 | 52.25 |
| 1.2 | 56.00 |
| 1.0 | 62.00 |
| 0.9 | 67.00 |
| 0.34 | 210.75 |

I therefore find that the values are as follows:

| Size | | Value in Reichs-marks per 100 kilos |
| --- | --- | --- |
| Diameter inches | Wire thickness millimeters | |
| 2 inches | 2.3 | 45.25 |
| 1¾ inches | 2.1 | 45.25 |
| 1 inch | 1.4 | 52.25 |
| ⅞ inch | 1.2 | 56.00 |
| ¾ inch | 1.0 | 62.00 |
| ⅝ inch | 0.90 | 67.00 |
| ⅜ inch | 0.34 | 210.75 |

From the above values should be deducted the items of freight and charges and insurance as per invoices, and the following discounts and allowances:

Discounts of 20 per centum and 5 per centum, a freight allowance of Reichs-marks 1.50 per 100 kilos, and 2 per centum cash discount.

All values are the foreign-market values.